**Eric B. HALPERN, Dr.,**
**Plaintiff–Appellant,**

v.

**FEDERAL BUREAU OF**
**INVESTIGATION,**
**Defendant,**

**United States Department of Justice,**
**Defendant–Appellee.**

**Docket No. 98–6035.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 5, 1998.

Decided June 22, 1999.

RALPH L. HALPERN, Buffalo, New York (Nicole C. Johnson, Jaeckle Fleischmann & Mugel, LLP, Buffalo, New York, of counsel), for Plaintiff–Appellant.

LYNN S. EDELMAN, Assistant United States Attorney, Buffalo, New York (Denise E. O'Donnell, United States Attorney, Western District of New York, Buffalo, New York, of counsel), for Defendant–Appellee.

Before: CARDAMONE, PARKER, and SACK, Circuit Judges

CARDAMONE, Circuit Judge.

This appeal requires us to reconcile conflicting public policy concerns embedded in the Freedom of Information Act, 5 U.S.C. § 552 (1994) (FOIA). Plaintiff Dr. Eric B. Halpern (plaintiff or appellant), who asserted that the Federal Bureau of Investigation improperly withheld information he requested under the Freedom of Information Act, appeals from a judgment entered on January 26, 1998 in the United States District Court for the Western District of New York before Judge Richard J. Arcara, which granted summary judgment in favor of the government and denied appellant's motion for the same relief.

Enacted by Congress in 1966 as a revision of § 3 of the Administrative Procedure Act, 5 U.S.C. § 1002 (1964), FOIA is broadly intended to permit citizens access to information in the possession of the federal government that is unnecessarily sheltered from public view. It emphasizes a preference for the fullest possible agency disclosure of such information consistent with a responsible balancing of competing concerns included in nine categories of documents exempted from the Act's disclosure requirements. *See United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754–55, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

The policy of full disclosure of all information not exempted serves the need for citizens to know what their government is up to and, generally, where the informa-

tion sought sheds light on an executive agency's performance of its official duties, full access to the information serves FOIA's purposes. There is a certain tension in balancing the public interest in having the government operate in the sunshine against the interests set forth in the exemptions that may, by shielding disclosure of information, keep the public in the dark. *See id.* at 762, 109 S.Ct. 1468. In resolving the conflict in this case, we must analyze two declarations furnished by the government to justify its refusal to disclose the information appellant sought. Under our precedents, such declarations are required to describe in reasonably specific terms the nature of the documents and the justification for nondisclosure. Although the author of one of the declarations wrote much, she said little; and she said nothing in particular that would justify withholding the documents the requester sought.

The records in question were compiled by the federal government while it surveilled the unionization of the meatpacking industry during the 1930s. The Federal Bureau of Investigation (FBI), desires to withhold portions of these voluminous records from Halpern under FOIA's exemptions from disclosure. Those exemptions, the discussion of which is the subject of this appeal, are national security, personal privacy, and confidentiality. To reconcile the noted incompatible policy concerns, we follow the path carved out by Congress in 1966: one that protects both interests as much as possible but places special emphasis on granting the fullest possible disclosure.

## BACKGROUND

Plaintiff is a lecturer in American History at University College London, England. He is an expert on unionism in the American meatpacking industry and has published extensively on the subject, perhaps most notably in his recent book, *Down on the Killing Floor* (1997). (The book traces the history of Chicago's meatpacking industry for 50 years from 1904–54, with particular emphasis on race relations among the packinghouse workers in Chicago's Southside slaughterhouses.)

In connection with his ongoing research in this field, Dr. Halpern submitted written requests to the FBI in 1989 and 1990 asking for the release of those records that would reveal the government's surveillance of the meatpacking industry during the 20 years between 1933 and 1954. On February 21, 1989 he requested "FBI case files pertaining to the activities of Herbert and Jane March," information regarding various Communist activities, and files covering the principal packinghouse owners: Armour, Swift, Wilson, Roberts & Oake, P.D. Brennan, Reliable, Agar, Illinois Meat, and G.H. Hammond. *See generally March v. Committee of Bar Examiners,* 67 Cal.2d 718, 63 Cal.Rptr. 399, 433 P.2d 191 (1967) (discussing Herbert March's role in the unionization movement). Plaintiff's later requests asked for searches of specific FBI filing systems, as well as for information about Henry Johnson.

Pursuant to plaintiff's FOIA requests, the FBI conducted searches for the requested subjects in its Central Records System (CRS). Within the CRS, records are indexed by subject into two general categories: the "main" index and the "reference" index. A record is retrievable through the "main" index if the name of the requested individual, organization, or activity is the main subject of that file. By contrast, a record is retrievable through the "reference" index if the file contains no more than a mention or reference (also known as a cross-reference) to the requested individual, organization, or activity. Normally, the FBI will process a file appearing in this latter index only when the search of the CRS does not locate any files on the requested subject through the "main" index. Otherwise, the requester is merely advised of the existence of cross-references and asked whether he would like those cross-references processed as well.

On several occasions between 1991 and 1993, the FBI released documents on the subjects of Halpern's FOIA requests as retrieved through the "main" index, but it withheld numerous pages either in whole or in part, citing national security, agency personnel rules and practices, personal privacy, and confidentiality interests. In most of its mailings, the FBI listed the main files it had uncovered and advised plaintiff that there were "additional references to the subjects of your FOIA requests in files relating to other individuals, organizations, events, or activities." In 1993, the FBI advised Halpern, "We will process these references if you now make a specific request for them," but Halpern failed to make such a request until February 15, 1995, nearly two years later.

The government further advised Halpern that additional information it had found pursuant to his requests was being withheld after consultation with other agencies from which the information had originated. One of these agencies, the United States Army Intelligence and Security Command (Army Intelligence), eventually declassified and released some of the information it had originally asked the FBI to have withheld from plaintiff. In late 1994 the FBI itself turned over an additional file on Herbert March—one previously misclassified by reason of a clerical error—and also released other information declassified pursuant to new guidelines issued by the United States Attorney General in October 1993. The total amount of material released to Halpern, including both the original releases and the later reclassifications, was 2400 pages, although many of those pages were partially or almost entirely redacted.

On January 10, 1994 plaintiff appealed to the Department of Justice Office of Legal Policy, Office of Information and Privacy for review of the FBI's refusals to turn over all the files he sought. His appeal focused on the failure to release "records generated, or documenting activities occurring, during the period 1930–39"

and the redactions of information made by the FBI in material it had already released to him. On May 24, 1994 the Office of Information and Privacy largely affirmed the FBI's actions, while noting the FBI's intent eventually to process the "cross references pertaining to Herbert and Jane March."

On June 3, 1994 plaintiff filed an amended complaint in the Western District of New York before Judge Arcara, naming the U.S. Department of Justice as defendant and claiming that the information he sought under 5 U.S.C. § 552(a)(4)(B) had been wrongfully withheld. The complaint sought preliminary and permanent injunctive relief against the continued withholding of the information encompassed by his original FOIA requests. In 1995 the FBI and plaintiff both moved for summary judgment. The district court, which had referred the matter to Magistrate Judge Leslie G. Foschio, granted the government's motion in January 1998 after adopting the findings of the magistrate judge. Judgment was entered in favor of the government on January 26, 1998. This appeal followed.

## DISCUSSION

### I The Freedom of Information Act

■ The Freedom of Information Act adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies. *See FLRA v. United States Dep't of Veterans Affairs,* 958 F.2d 503, 508 (2d Cir.1992); *Donovan v. FBI,* 806 F.2d 55, 57–58 (2d Cir.1986), *abrogated on other grounds, United States Dep't of Justice v. Landano,* 508 U.S. 165, 170, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). Specifically, FOIA requires that "each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules ..., shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3) (1994).

■ In recognition of those interests that may at times conflict with this policy of full disclosure, FOIA also provides nine exemptions from its disclosure requirement, of which the following three are here implicated: the national security exemption, § 552(b)(1) (Exemption 1); the law enforcement exemption for personal privacy, § 552(b)(7)(C) (Exemption 7(C)); and the law enforcement exemption for confidentiality, § 552(b)(7)(D) (Exemption 7(D)). Agency information falling within the terms of these exemptions need not be disclosed. *See FLRA,* 958 F.2d at 508; *Donovan,* 806 F.2d at 58.

■ The primary question presented in this case—the usual question raised in FOIA litigation—is whether the information withheld properly falls within the scope of the exemptions. FOIA clearly contemplates judicial review of agency decisions to withhold information and provides that a reviewing court "shall determine the matter *de novo,* and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions . . ., and the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). In keeping with the policy of full disclosure, the exemptions are "narrowly construed with doubts resolved in favor of disclosure." *FLRA,* 958 F.2d at 508.

■ The specific and very difficult issue with which this Court must contend on appeal is the degree of specificity required by the government when the government asserts to the court, in a sworn affidavit, that the redacted information falls within one of the nine statutory exemptions. When a government agent can attest in a sworn affidavit that the redactions are necessary, and elaborate on the reasons for the redactions with sufficient specificity, the district court should be able to rule on the appropriateness of the redactions without conducting an *in camera* review of the redacted materials. However, while on the one hand, too much specificity on the part of the government can actually reveal the classified information, too little specificity can render judicial review of the agency's decisions all but impossible. Thus, it is the government's level of specificity in explaining the redactions it has made that is the focus of this decision.

## II Standard of Review

■ Ordinarily, on an appeal from a grant of summary judgment, we review the record *de novo* to determine whether there are genuine issues of material fact requiring a trial. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Metaphysical doubt, conjecture, or surmise cannot establish such dispute and defeat the motion. *See id.*

■ The government suggests we modify this standard of review in the FOIA context, and accord deference to a district court's grant of summary judgment. It points out that while some courts of appeals apply a pure *de novo* standard, others first review *de novo* whether the district court had an adequate factual basis for its determination and then review the district court's determination itself for clear error. *Compare Sheet Metal Workers Int'l Ass'n v. United States Dep't of Veterans Affairs,* 135 F.3d 891, 896 & n. 3 (3d Cir.1998) (adopting the latter two-step approach), *with Summers v. Department of Justice,* 140 F.3d 1077, 1080 (D.C.Cir. 1998) ("[O]ur task on appeal is the same as the task faced by the district court—reviewing the record *de novo* to determine whether genuine issues of material fact would preclude summary judgment," *i.e.,* "whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure under the FOIA.").

We see no compelling reason to depart from a pure *de novo* standard. First, our FOIA decisions that do articulate a stan-

dard of review simply adopt the *de novo* standard without further adopting the nuances suggested by the government. *See, e.g., A. Michael's Piano, Inc. v. FTC,* 18 F.3d 138, 141, 143, 146 (2d Cir.1994); *Massey v. FBI,* 3 F.3d 620, 622 (2d Cir.1993); *Hopkins v. United States Dep't of Hous. & Urban Dev.,* 929 F.2d 81, 84 (2d Cir.1991). *Cf. Carney v. United States Dep't of Justice,* 19 F.3d 807, 814 (2d Cir.1994) (district court's standard for reviewing agency decision on fee waiver). *But cf. United Techs. Corp. v. NLRB,* 777 F.2d 90, 94 (2d Cir.1985) (district court's factual finding that confidential sources had justified expectation of confidentiality was not clearly erroneous).

Second, a pure *de novo* standard faithfully tracks the language of FOIA, which requires that "the court shall determine the matter *de novo.*" § 552(a)(4)(B) (emphasis added). Third, such standard is more consistent with Congress' purposes in enacting FOIA. As we have explained:

> In striking a balance between the incompatible notions of disclosure and privacy when it enacted FOIA in 1966, Congress established—in the absence of one of that law's clearly delineated exemptions—a general, firm philosophy of full agency disclosure, and provided *de novo* review by federal courts so that citizens and the press could obtain agency information wrongfully withheld. *De novo* review was deemed essential to prevent courts reviewing agency action from issuing a meaningless judicial imprimatur on agency discretion.

*A. Michael's Piano, Inc. v. FTC,* 18 F.3d at 141 (citing S.Rep. No. 813, 89th Cong., 1st Sess. 2, 8 (1965)).

We are not unmindful of the institutional pressures that might make a more deferential standard of review seem appealing. *See generally Summers,* 140 F.3d at 1080–81 (discussing the difficulties of appellate review unique to FOIA litigation). Yet, because the *de novo* standard is more faithful to the text, purpose, and history of FOIA, particularly as that statute has

been interpreted within this Circuit, we are not inclined to abandon it. Accordingly, to the extent that our prior decisions may have been less than fully clear on this point, we now clarify that a *de novo* standard of review applies on appeal from a district court's grant of summary judgment in FOIA litigation.

### III The Cross–Referenced Files

██ Before analyzing the merits of the FOIA withholding claims, we first consider appellant's contention that the grant of summary judgment is premature because the FBI has not yet processed the cross-referenced files that pertain to the subjects of his original requests. In considering this issue, the magistrate judge reasoned that because Halpern had failed before February 15, 1995 to request that the FBI process the cross-referenced files, his request was not properly within the scope of the June 3, 1994 amended complaint and therefore was not a bar to summary judgment. On appeal, Halpern disputes this conclusion, arguing that we should instead broadly interpret the language of his original FOIA request and of his amended complaint to encompass the cross-referenced files.

██ Even assuming that plaintiff has exhausted his administrative remedies with respect to these files, *see* 5 U.S.C. § 552(a)(6)(C)(i), his arguments are unpersuasive. The case law indicates that a FOIA request binds an agency to disclose information to the extent that " 'the agency is able to determine precisely what records are being requested.' " *Kowalczyk v. Department of Justice,* 73 F.3d 386, 388 (D.C.Cir.1996) (quoting *Yeager v. DEA,* 678 F.2d 315, 326 (D.C.Cir.1982)). When the request demands all agency records on a given subject then the agency is obliged to pursue any "clear and certain" lead it cannot in good faith ignore. *Id.* at 389. But, an agency need not conduct a search that plainly is unduly burdensome. *See Ruotolo v. Department of Justice, Tax Div.,* 53 F.3d 4, 9 (2d Cir.1995).

Under the *Kowalczyk* standard, the FBI initially was bound to process the cross-referenced files according to the terms of Halpern's original FOIA requests. But, in light of the burdens this task would have imposed, it was reasonable for the FBI to ask Halpern to clarify the precise scope of his request, as it did in early 1993 when it indicated the existence of the cross-referenced files and offered to process them upon specific request. In many FOIA cases requests for clarification are necessary from a practical standpoint to justify the heavy expenditure of agency resources needed to process the unearthed files. *See, e.g., Carney*, 19 F.3d at 810 (FOIA request retrieved 111 boxes, each containing about 5000 pages); *Meeropol v. Meese*, 790 F.2d 942, 946, 951 (D.C.Cir.1986) (500,-000 pages retrieved).

Once the FBI had requested such clarification, it could then in good faith ignore the cross-referenced files until it received an affirmative response from plaintiff. *Cf. Kowalczyk*, 73 F.3d at 389 (agency only needs to pursue leads that are clear and certain). Because Halpern did not respond to the request for clarification until after he filed his amended complaint, he lacked any grounds on which to plead that the FBI had failed to process the files.

On that basis alone, we rule that the cross-referenced files are not properly within the scope of the present litigation and present no bar to summary judgment. However, were this a case where the FBI had declined to process the cross-referenced files without explicitly requesting clarification, we would be strongly inclined to hold in favor of the requester. *Cf. Ruotolo*, 53 F.3d at 10 (holding that under 28 C.F.R. § 16.3(b), the Department of Justice had a duty to assist FOIA requesters "in reformulating their request if it was thought that the request needed to be narrowed"). Having resolved that summary judgment was not granted prematurely, we turn to the merits of Halpern's appeal.

## IV Exemption 1

Appellant's first challenge to the grant of summary judgment is that the FBI failed to sustain its burden of proof under § 552(a)(4)(B) with respect to its redaction of information pursuant to Exemption 1, the national security exemption. That Exemption states that FOIA's requirement of agency disclosure "does not apply to matters that are … (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

### A. *The Applicable Executive Order*

The parties are in disagreement over which Executive Order governs the application of Exemption 1 for the purposes of this case. The FBI relies on Executive Order 12,356 that was in effect at the time the government made its classification decisions in the present case. *See* 47 Fed. Reg. 14,874 (Apr. 2, 1982), *reprinted as amended in* 50 U.S.C. § 435 at 121–26 (1994). Halpern invokes the more liberal standards of Executive Order 12,958, which took effect on October 14, 1995, well after the agency decisions in question. *See* 60 Fed.Reg. 19,825 (Apr. 17, 1995), *reprinted as amended in* 50 U.S.C. § 435 at 842–50 (1994 & Supp. I 1995).

The governing rule is that an agency's decision to withhold information under FOIA is reviewed under the Executive Order upon which the classification determination was made. *See Lesar v. United States Dep't of Justice*, 636 F.2d 472, 480 (D.C.Cir.1980); *Diamond v. FBI*, 707 F.2d 75, 78 & n. 4 (2d Cir.1983) (reviewing an agency decision under FOIA according to the terms of Executive Order 12,065 even though Executive Order 12,356 had since taken effect). Thus, Executive Order 12,356 governs the application of Exemption 1 on the instant appeal.

Section 1.3(a) of Executive Order 12,-356 requires that information be considered for classified status if it concerns any one of ten categories of sensitive material. Of those categories, four are here implicated: "(3) foreign government information; (4) intelligence activities (including special activities), or intelligence sources or methods; (5) foreign relations or foreign activities of the United States"; and "(8) cryptology." *Id.*

Information falling into any one of these categories will be classified if the "unauthorized disclosure [of this information] reasonably could be expected to cause damage to the national security." *Id.* § 1.3(b). Once classified, information is then labeled under § 1.1(a) either (1) as "Top Secret" if the damage from unauthorized disclosure would be "exceptionally grave"; (2) as "Secret" if such damage would be "serious"; or (3) as simply "Confidential" in all other cases where disclosure could cause "damage" to the national security. Regardless of what label attaches, classification of information results in exemption from FOIA's disclosure requirement.

### B. *The FBI's Vaughn Affidavit*

Because appellant does not challenge the procedures used to classify the redacted information, the only issue raised is whether the FBI has adequately shown that the redacted information logically falls within the classification categories established by Executive Order 12,356. The district court found that the FBI had sustained its burden of proof in this respect through the Declaration of FBI Supervisory Special Agent Sherry L. Davis (Dec. 16, 1994) (Davis Declaration). On its face, the Davis Declaration appears to fall into that category of documents well-known to FOIA litigation as a *Vaughn* affidavit. Before discussing the Davis Declaration, it will be helpful to review briefly the history and purpose of such affidavits.

### 1. *Vaughn v. Rosen*

In *Vaughn v. Rosen,* the District of Columbia Circuit Court of Appeals conceived of the document now known as the *Vaughn* affidavit as a means of overcoming the institutional difficulties inherent in FOIA litigation. 484 F.2d 820 (D.C.Cir.1973). Specifically, the court observed that *de novo* review of nondisclosure in an adversarial tribunal could be "seriously distort[ed]" by the fact that the party seeking disclosure suffers from a lack of knowledge, relative to the agency, as to the precise contents of the documents in question. *Id.* at 824–25. In addition, the court acknowledged the institutional incentives that might encourage an agency to withhold as much information as possible and to claim the broadest possible exemptions under FOIA, thereby shifting the burden to the courts to sort through a seemingly endless "morass of material." *Id.* at 826.

To correct the adversarial imbalance of information, and to permit more effective factual review, *Vaughn* held that an agency could meet its burden in FOIA litigation only by submitting documentation that met the following two requirements: First, the documentation must include "a relatively detailed analysis [of the withheld material] in manageable segments" without resort to "conclusory and generalized allegations of exemptions." *Id.* Second, the documentation must also provide "an indexing system [that] would subdivide the [withheld] document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification." *Id.* at 827; *see also Ray v. Turner,* 587 F.2d 1187, 1191–92 (D.C.Cir.1978) (discussing *Vaughn* ).

Over the years, as the *Vaughn* standard was adopted by other courts, its articulation was refined. *See generally Davin v. United States Dep't of Justice,* 60 F.3d 1043 (3d Cir.1995) (applying the *Vaughn* standard); *Ruotolo,* 53 F.3d at 5 (same); *Church of Scientology, Int'l v. United States Dep't of Justice,* 30 F.3d 224 (1st Cir.1994) (same); *Wiener v. FBI,* 943 F.2d

972 (9th Cir.1991) (same). As the Court of Appeals for the District of Columbia later explained the standard, using what has now become common terminology:

The agency [seeking to justify the withholding of information] may satisfy [the *Vaughn* ] standard by submitting affidavits to the court that describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure; the description provided in the affidavits must show that the information logically falls within the claimed exemption.

*Lesar,* 636 F.2d at 481.

In addition, a number of courts, including our own, have eschewed rigid adherence to any particular indexing format under the *Vaughn* standard, opting instead for a functional approach. *See, e.g., Keys v. United States Dep't of Justice,* 830 F.2d 337, 349 (D.C.Cir.1987) ("As our post-*Vaughn* opinions make clear, it is the function, not the form, of the index that is important."); *Donovan,* 806 F.2d at 58–59 ("[I]t must be emphasized that these requirements are not ends in themselves, but are merely methods or procedures that assist the trial court in its do novo [sic] review."). As the *Keys* court explained, a *Vaughn* affidavit serves three functions:

[1] it forces the government to analyze carefully any material withheld, [2] it enables the trial court to fulfill its duty of ruling on the applicability of the exemption, [3] and it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court.

830 F.2d at 349 (quoting *Lykins v. United States Dep't of Justice,* 725 F.2d 1455, 1463 (D.C.Cir.1984)).

### 2. *The 1974 Amendments to FOIA*

At the time *Vaughn* was decided in 1973, outside events occurred that would influence evaluation of *Vaughn* affidavits with respect to Exemption 1. In early 1973 the U.S. Supreme Court held in *EPA v. Mink*

that FOIA did not permit *in camera* inspection of material withheld under Exemption 1. 410 U.S. 73, 81–84, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). The Court explained that the sole inquiry, on review of an agency's decision to withhold under this Exemption, was "whether the President has determined by Executive Order that particular documents are to be kept secret." *Id.* at 82, 93 S.Ct. 827. Once it was verified that the material in question had been classified pursuant to Executive Order, the judicial inquiry must end, and judgment must be entered in the agency's favor.

The following year Congress overruled *Mink* by amending FOIA. Freedom of Information Act, Pub.L. No. 93–502, 88 Stat. 1561 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 1798. Among other changes, the new legislation reworded 5 U.S.C. § 552(b)(1), clarified that *de novo* review should apply in all cases, and specifically extended the language of FOIA's provision for *in camera* inspection to encompass Exemption 1. *See id.* §§ 1(b)(2), 2(a); *see generally Ray,* 587 F.2d at 1190–95 (discussing the 1974 amendments). That Congress felt strongly about this issue is shown by the fact that although the legislation was initially vetoed by President Ford, Congress overrode the President's veto by supermajorities of 371 to 31 in the House and 65 to 27 in the Senate. *See* Robert P. Deyling, *Judicial Deference and De Novo Review in Litigation over National Security Information Under the Freedom of Information Act,* 37 Vill. L.Rev. 67, 76 (1992); *see also United States Dep't of Justice v. Julian,* 486 U.S. 1, 19, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988) (Scalia, J., dissenting) (noting that "one of the most controversial features of the 1974 amendments to the FOIA was the revision of § 552(b)(1) to overturn the holding of *Mink* regarding Exemption 1" (citing President's Message to the House of Representatives Returning H.R. 12471 Without His Approval, 10 Weekly Comp. of Pres. Doc. 1318 (1974))).

At the same time the Senate Conference Report, accompanying the legislation, expressed concern as to the "adverse affects [sic] [that] might occur as a result of public disclosure of a particular classified record." S. Conf. Rep. No. 93–1200, at 12 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6285, 6290. "Accordingly," the Report continued, "the conferees expect that Federal courts, in making *de novo* determinations ..., will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.; see also Diamond,* 707 F.2d at 79 (noting that "substantial deference" must be given to *Vaughn* affidavits in the national security context).

In their final form, the 1974 Amendments left it to the courts to strike a balance between these seemingly contradictory directives of *de novo* review, on the one hand, and substantial deference, on the other. *See generally* Deyling, *supra,* at 82–94 (discussing this case law and the underlying policy tensions). With respect to *in camera* review, we adopted a restrained approach permitting such review where the record showed the reasons for withholding were vague or where the claims to withhold were too sweeping or suggestive of bad faith, or where it might be possible that the agency had exempted whole documents simply because there was some exempt material in them. *See Lead Indus. Ass'n v. OSHA,* 610 F.2d 70, 88 (2d Cir.1979). By the same token, where the affidavit is sufficiently detailed to place the documents within the claimed exemptions, and where the government's assertions are not challenged by contrary evidence or a showing of agency bad faith, we have held that the district court should restrain its discretion to order *in camera* review. *See Doherty v. United States Dep't of Justice,* 775 F.2d 49, 52–53 (2d Cir.1985).

### 3. *The Davis Declaration*

■ Against this backdrop, we proceed to examine the Davis Declaration in some detail. The main body of the Declaration discusses in general terms the FBI's classification procedures, Exemption 1, Executive Order 12,356, and the reasons why disclosure of the types of information categorized in § 1.3(a) of Executive Order 12,-1356 could reasonably be expected to cause damage to the national security.

Appendix A to the Davis Declaration provides a "Code Catalog Index" that designates symbols as representing the various categories of information established by the Executive Order. This Code is key to understanding the Declaration generally and the reasons advanced for avoiding disclosure specifically. For example, the symbol "(b)(1)—(A)(M)" is defined to represent "Intelligence Activity and/or Method Information," *i.e.,* specific information classified pursuant to § 1.3(a)(4) of Executive Order 12,356. Appendix A goes on to describe the types of information represented by these symbols and to explain why disclosure would damage national security.

The helpfulness of the Davis Declaration lies in the fact that the symbols defined in the Code Catalog Index correlate to specific redactions in the documents released to Halpern, reprinted in the record in this case as Exhibit "NN." On a given page in Exhibit "NN," redacted information has been physically effaced by some sort of black marker, and in the margin next to the effacement appears a symbol, for example, "(b)(1)—(A)(M)," referring the reader back to the corresponding explanation in Appendix A as to why the effaced information was classified and redacted pursuant to Executive Order 12,356.

To give a flavor for the level of detail provided in the Davis Declaration, we have attached an Appendix at the end of this opinion that recites a few passages in full. One passage taken from the main body of the Declaration explains in general terms why information was redacted under the category "Intelligence activities and/or methods." *See* Appendix, 1. Another passage goes on to explain the redactions designated by code symbol "(b)(1)—

(A)(M)" for "Intelligence Activity and/or Method Information." *See* Appendix, 2.

### C. *Analysis*

The passages quoted give a reader some insight into the Declaration, which occupies 37 pages of the record. We think the explanations contained in it are insufficient, in and of themselves, to sustain the government's burden of proof. Assessed in terms of "reasonable specificity," the explanations read more like a policy justification for § 1.3(a)(4) of Executive Order 12,356, while barely pretending to apply the terms of that section to the specific facts of the documents at hand. The affidavit gives no contextual description either of the documents subject to redaction or of the specific redactions made to the various documents. Although we appreciate the difficulty of providing such specificity in the context of a broad FOIA request, the lack of specificity is particularly troubling in light of the fact that Exemption 1 was invoked with respect to only 21 of the 2400 pages released to appellant.

Even more significant under the "reasonable specificity" standard is the affidavit's failure to fulfill the functional purposes addressed in *Vaughn*, 484 F.2d at 820. For instance, consider the assertion that "[t]his information ... is specific [and] [t]herefore ... would automatically reveal ... United States intelligence-gathering capabilities." Such a conclusory statement completely fails to provide the kind of fact-specific justification that either (a) would permit appellant to contest the affidavit in adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the FBI's redactions. Rather, we and appellant have no other option than to defer to the government's decision to classify the redacted information under Executive Order 12,356, unless we conduct a lengthy *in camera* review of the documents, which, of course, defeats the purpose of a *Vaughn* affidavit. But, as discussed earlier, blind deference is precisely what Congress rejected when it amended FOIA in 1974.

We find strong support for this view from four other courts of appeals that have reached the same conclusion regarding similarly vague and conclusory affidavits that we must say read much like bureaucratic double-talk. *See Davin*, 60 F.3d at 1050–51 (3d Cir.) ("[A] categorical approach, without the inclusion of specific factual information that correlates the claimed exemptions to the withheld documents, is not a sufficient *Vaughn* index."); *Church of Scientology, Int'l*, 30 F.3d at 230–35 (1st Cir.) (same); *Wiener*, 943 F.2d at 977–79 (9th Cir.) ("boilerplate" explanations without an effort to "tailor the explanation to the specific document withheld" were insufficient); *King v. United States Dep't of Justice*, 830 F.2d 210, 219–25 (D.C.Cir.1987) ("[c]ategorical description[s] of redacted material coupled with categorical indication of anticipated consequences of disclosure" was "clearly inadequate."); *see generally Samuel Gruber Educ. Project v. United States Dep't of Justice*, 24 F.Supp.2d 1, 5–8 (D.D.C.1998) (discussing "the near universal condemnation" of this categorical indexing scheme). In fact, two of these decisions rejected agency justifications that are, for all practical purposes, indistinguishable from the passages quoted above. *See Wiener*, 943 F.2d at 981 & n. 15; *King*, 830 F.2d at 221–23 & nn. 92–99.

In addition to the quoted passages, the entire Davis Declaration, considered in its own right, generally fails to pass muster under the reasonable specificity standard. At the same time, we take note of the district court's finding that some of the redacted documents as reprinted in Exhibit "NN" may provide sufficient additional contextual information to justify redaction. *See King*, 830 F.2d at 221 ("[A] reproduction of the redacted documents can only show the court the context from which an item has been deleted, and context may or may not assist the court in assessing the character of the excised material and the grounds for its deletion."); *Samuel Gruber*

*Educ. Project,* 24 F.Supp.2d at 9 (noting that "deletions of a word or words [may be] obvious from the context").

Here, the district court found that even where a complete page was redacted, it was fairly clear, nevertheless, that the document related to the asserted exemption. By way of example, the court cited to page 14 of Document 28 to Exhibit "NN," which contains a large body of redacted text accompanied by the symbol "(b)(1)—(S)(I)," referring the reader to the Davis Declaration's explanation of "Source Identifier[s]" within the larger category of "Intelligence Source Information." The context of the redacted text, specifically page 11 of the same document, contains a header suggesting that the redacted information pertains to the identity of a source who gave information to the FBI's Chicago Office regarding a subject known by the alias "Harry Martin."

■ Although this contextual information probably meets the reasonable specificity standard, the government's failure to include this detail in its affidavit undermines one of the key purposes of *Vaughn* by shifting to the courts the burden to wade through pages of material in search of contextual support for the government's own redactions. *See King,* 830 F.2d at 220–21 (Apparently the FBI is of the opinion that, "by submitting to the court a reproduction of the redacted file, it is relieved of the obligation of describing the withheld material in detail."). When the Davis Declaration is viewed against the accompanying Exhibit "NN," it becomes rather obvious that the abbreviated style of the Davis Declaration is not only to preserve national security, but to relieve government agents of a substantial amount of paperwork. Placing such a burden on the shoulders of the district court, however, is not a workable solution. What a district court needs from the government, in a *Vaughn* affidavit, is information that is not only specific enough to obviate the need for an *in camera* review, but that also enables the court to review the agen-

cy's claimed redactions without having to pull the contextual information out of the redacted documents for itself.

■ In other words, the government, when it invokes Exemption 1, must submit itemized descriptions of the context out of which specific redactions are made. The government may find it useful and efficient to use symbols cross-referencing generalized justifications for certain types of redactions as well, as the government did in this case, but those generalized descriptions must accompany, and not substitute for, particularized descriptions of the context surrounding each of the individual redactions and/or documents.

Further, when a district court responds to such an affidavit by making a generalized ruling approving of the redactions as a whole (as the district court did here), rather than making itemized rulings regarding specific pages or documents, *de novo* review of the district court's decision is virtually impossible.

### D. *Guidance on Remand*

■ In light of the remand directed, we think it helpful to the district court to clarify several points raised by the parties, but not earlier commented upon. First, the passage of many years is an insufficient reason to require the release of documents. *See, e.g., Diamond,* 707 F.2d at 76 ("It would have been a simple matter for Congress to have included a provision in FOIA requiring release of all documents of a certain vintage."). Second, the application of Exemption 1 is generally unaffected by whether the information has entered the realm of public knowledge. A limited exception is permitted only where the government has officially disclosed the specific information the requester seeks. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 421 (2d Cir.1989). Third, we see no bad faith, as appellant asserts, on the part of the FBI. Because certain materials originally withheld from him by Army Intelli-

gence were later declassified and released voluntarily, he argues that other information may have been improperly classified. But, Army Intelligence's decision to declassify has little probative value, given that the FBI is a separate agency with distinct jurisdiction over the subject documents. Even if there were no jurisdictional problem, the voluntary release of previously withheld documents "does not [by itself] demonstrate bad faith." *See Bonner v. United States Dep't of State*, 928 F.2d 1148, 1152 (D.C.Cir.1991).

■ Fourth, the government contends that reversing the judgment would contravene Congress' directive that courts accord substantial weight to agency affidavits in FOIA litigation. But, the good faith presumption that attaches to agency affidavits only applies when accompanied by reasonably detailed explanations of why material was withheld. Absent a sufficiently specific explanation from an agency, a court's *de novo* review is not possible and the adversary process envisioned in FOIA litigation cannot function. *See Church of Scientology, Int'l*, 30 F.3d at 233. In addition, the government notes the Davis Declaration's assertion that "any greater specificity [in the affidavit] ... could reasonably be expected to jeopardize the national security of the United States." In this regard, the government cites *Diamond v. FBI*, where we explicitly deferred to a similar assertion by the FBI pursuant to Exemption 1. *See* 707 F.2d at 79. That statement was made, however, in a context where the district court already had engaged in *in camera* review and, "[h]aving examined each document, ... was persuaded by the assertion" that further specificity would threaten the national security. *Id.* Since neither the district court nor we have reviewed the unredacted documents *in camera*, deference to such a conclusory "catch-all" assertion is inappropriate at this stage.

■ Fifth, we decline to address the merits of appellant's contention that the district court abused its discretion by declining to require *in camera* review of the unredacted documents. Arguably, such review would have been appropriate—given the conclusory nature of the Davis Declaration—but such action is one best left to the trial court's discretion on remand. *See Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988) ("*In camera* review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion.").

At that time, the district court will have a number of options for eliciting further detail from the government. It may require supplemental *Vaughn* affidavits or may permit appellant further discovery. *See King*, 830 F.2d at 225. If the choice is either of these, the goal should be to obtain a sufficient degree of detail so as to fulfill the purposes of the *Vaughn* affidavit. In the alternative, the trial court may offer the government the option of submitting additional *Vaughn* affidavits for *in camera* review, particularly if the government holds fast to its view that revealing any greater specificity in open court could compromise national security.

■ Moreover, the district court may, in its discretion, order *in camera* review of the unredacted documents themselves. Still, "the district court's inspection prerogative is not a substitute for the government's burden of proof, and should not be resorted to lightly." *Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 743 (9th Cir.1980). Whatever route the district court chooses, however, it should make itemized findings, ideally with respect to specific documents or redactions, but at least at such a level of detail as to permit effective *de novo* review, if required, in the future. *See generally Wiener*, 943 F.2d at 987–88 (discussing the degree of detail required in district court findings).

## V Exemption 7

Halpern next asserts the government failed to sustain its burden of proof with

respect to the redaction of information pursuant to Exemption 7. Exemption 7 exempts from disclosure those records compiled for law enforcement purposes, the release of which could reasonably be seen as an unwarranted invasion of personal privacy 7(C), or could reasonably be anticipated to disclose the identity of a confidential source 7(D). These two subdivisions of Exemption 7 are reproduced in the margin.[1]

### A. Valid Law Enforcement Purpose

■ It must first be decided whether the government has properly demonstrated that the records and information sought were "compiled for law enforcement purposes" under § 552(b)(7). In particular, Halpern contests our rule that once the government has demonstrated that the records were compiled in the course of an investigation conducted by a law enforcement agency, the purpose or legitimacy of such executive action are not proper subjects for judicial review. See Ferguson v. FBI, 957 F.2d 1059, 1070 (2d Cir.1992); Williams v. FBI, 730 F.2d 882, 883 (2d Cir.1984). In other words, all records of investigations compiled by the FBI are for law enforcement purposes. We cannot depart from the established rule of the Circuit as set forth in Ferguson and Williams. See In re The Mediators, Inc., 105 F.3d 822, 828 (2d Cir.1997). Further, while appellant challenges our rule, he does not dispute the fact that the records he seeks were compiled during the course of various FBI investigations.

### B. Exemption 7(C)—Personal Privacy

■ The district court found the FBI had sustained its Exemption 7(C) burden

of proof based on the Declaration of FBI Supervisory Special Agent Robert A. Moran (Dec. 22, 1994) (Moran Declaration). Like the Davis Declaration, the Moran Declaration is essentially a coded index that employs symbols to correlate specific redactions in Exhibit "NN" to categorical explanations within the Declaration itself. The explanations discuss in generalized terms why the following categories of information were redacted pursuant to this Exemption: (1) the names, initials, identifying information, and personal information of FBI employees, (2) of non-FBI government employees, (3) of non-federal law enforcement officers, (4) of persons who furnished information to the FBI, (5) of third parties mentioned in FBI files, and (6) of third parties who were of investigative interest to the FBI.

■ In reviewing the Moran Declaration, we are guided by the Supreme Court's decision in United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, which explained that Exemption 7(C) applies where the invasion of personal privacy resulting from release of the information would outweigh the public interest in disclosure. 489 U.S. at 762, 109 S.Ct. 1468. Applying this test in Massey, we concluded that the FBI was justified in redacting information from a newspaper article and an internal FBI memorandum relating to a murder investigation, where release of the information would have disclosed "the identities of FBI agents, cooperating witnesses and third parties, including cooperating law enforcement officials." 3 F.3d at 624.

■ In reaching this conclusion, we explained that government employees and officials, particularly law enforcement per-

1. (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, [or] (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any

private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source[.]

5 U.S.C. § 552(b)(7)(C)-(D) (1994).

sonnel, have privacy interests to the extent that revelation of their identities "could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs." *Id.* Third parties, moreover, have perhaps even stronger privacy interests insofar as the material in question demonstrates or suggests they had at one time been subject to criminal investigation. *See Reporters Comm.,* 489 U.S. at 767, 109 S.Ct. 1468. Confidentiality interests cannot be waived through prior public disclosure or the passage of time.

Balanced against such privacy interests is the countervailing FOIA design of disclosing internal agency conduct to the public. Here, the public interest in identifying law enforcement personnel is small since that information sheds little light if any on the conduct and administration of FBI investigations. Likewise, there is little or no public interest in having the identities of private parties revealed because that information sheds little or no light on the FBI's performance. Since the public interest in this information is outweighed by relevant privacy interests of the individuals involved, the redaction of such information should be upheld.

■ In the present case, appellant does not allege specific wrongdoing by the FBI that might implicate the need for public disclosure of officials' identities. Nor does Halpern's status as an historian with a unique interest in the redacted material alter this calculus, since "the identity of the requesting party has no bearing on the merits of his or her FOIA request." *Reporters Comm.,* 489 U.S. at 771, 109 S.Ct. 1468; *see also FLRA,* 958 F.2d at 510–11 (explaining that FOIA's sole purpose is "exposing agency action to public scrutiny").

Moreover, we decline to adopt Dr. Halpern's contention that the Moran Declaration's descriptions of the redacted material are too vague and conclusory to survive summary judgment under the *Vaughn* standard. Admittedly, many of these descriptions operate at a level of generality comparable to that of the Davis Declaration, which we explicitly rejected as inadequate. The distinction lies in the differences between the respective types of information subject to redaction under Exemption 1 and Exemption 7(C).

Under Exemption 1, it makes sense to require itemized descriptions of documents and/or redactions in the government's *Vaughn* affidavits since these descriptions are likely to have a direct bearing on the types of information contained in the document that are subject to redaction. Under Exemption 7(C), in contrast, the relationship between the type of document and the identifying information subject to redaction is likely to be more attenuated since the identity of the person providing the substantive information that characterizes the document is, to some extent, arbitrary. For example, the fact that a document contains a field officer's report on Jane March's ties to particular Communist organizations may have relevance as to whether the document implicates national security interests, but this additional information has relatively little bearing on the identity of the field officer.

■ Thus, we do not see much to be gained by remanding with instructions that the government provide further detail. To the extent that such a remand would require the government to describe the documents themselves in greater detail, the additional detail would prove unhelpful for the reasons discussed above. Because even a higher level of specificity would prove unhelpful, remanding would effectively require *in camera* review both in this case and in future cases every time the government invoked Exemption 7(C). Yet, our case law makes clear that such review is the exception, not the rule. *Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO,* 845 F.2d at 1180.

■ In sum, what constitutes a "reasonable" level of specificity varies depending on the particular context. *Cf. Re-*

*porters Comm.,* 489 U.S. at 776–80, 109 S.Ct. 1468 (rap sheets are *per se* exempt from disclosure under Exemption 7(C)). In the present context, the degree of specificity provided by the Moran Declaration is in fact reasonable. *See Keys,* 830 F.2d at 346–47, 349 (upholding, after *in camera* review, affidavits that categorized redactions by three headings: "individuals mentioned in FBI investigative files," "subjects of FBI investigations," and "FBI informants"); *King,* 830 F.2d at 232 & n. 160 (upholding comparable affidavits under Exemption 7(C) while also remanding under Exemption 1).

■■■ Our holding is not intended to relieve the government of all duty to provide further detail every time it invokes Exemption 7(C). To the contrary, a district court should be particularly receptive, for example, to a request by a party that the government provide itemized descriptions of documents and redactions appearing in a representative sample of the material in question. *See, e.g., Meeropol,* 790 F.2d at 956–57 (approving of random sampling approach); *cf. Jones v. FBI,* 41 F.3d 238, 243 (6th Cir.1994) (court conducted *in camera* examination of about 200 randomly selected pages together with about 350 other pages selected by plaintiff).

But where, as here, the amount of redacted material is unwieldy—and plaintiff has not requested such a sampling—remand would not be useful. Reasonableness demands a certain respect for the practicalities of the situation. The government has sustained its burden of demonstrating that Exemption 7(C) should shield the release of information compiled for law enforcement purposes because such release would in this case constitute an unwarranted invasion of personal privacy.

### C. *Exemption 7(D)—Identity of a Confidential Source*

The district court also ruled that the Moran Declaration satisfied the government's burden of proof with respect to Exemption 7(D). Once again, the Declaration followed the same coded index format to correlate specific redactions in Exhibit "NN." These explanations tell why various categories of information were redacted pursuant to Exemption 7(D), *i.e.,* because of the express or implied confidentiality of these sources as well as the information provided by them.

■■■ Under Exemption 7(D), our review of the Moran Declaration is guided by the Supreme Court's decision in *Landano,* 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84. There the Court explained that under this Exemption "[a] source should be deemed confidential if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *Id.* at 174, 113 S.Ct. 2014. As such, disclosure is not required "if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Id.* at 172, 113 S.Ct. 2014 (quoting S.Rep. No. 1200, 93d Cong., 2d Sess. 13 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6285, 6291).

#### 1. *Express Confidentiality*

■■■ The Moran Declaration first asserts that three categories of information were redacted pursuant to express assurances of confidentiality: (1) permanent symbol source numbers; (2) temporary source symbol numbers (T symbols); and (3) information provided by permanent symbol source numbers and confidential sources of the FBI. In this context, *Landano* requires an executive branch agency to proffer probative evidence that a claimed source of information did in fact receive an express promise of confidentiality. *See Davin,* 60 F.3d at 1061 (citing *Landano,* 508 U.S. at 172, 113 S.Ct. 2014); *see also Ferguson v. FBI,* 83 F.3d 41, 42–43 (2d Cir.1996) (per curiam) (agency burden of proof satisfied by affidavit declaring "that these assurances [of confidentiality]

are set forth either in the documents themselves or in the source's informant file"). · Proof of such express assurances may take a number of forms, including

declarations from the agents who extended the express grants of confidentiality, contemporaneous documents from the FBI files reflecting the express grants of confidentiality, evidence of a consistent policy of expressly granting confidentiality to certain designated sources during the relevant time period, or other such evidence that comports with the Federal Rules of Evidence.

*Davin*, 60 F.3d at 1061.

■ Nothing in the Moran Declaration provides the type of proof required under this standard. Rather, the Declaration relies on bare assertions that express assurances were given to the sources in question, and that the information received was treated in a confidential manner during and subsequent to its receipt. Clearly this is insufficient to prove an express grant of confidentiality. At the same time, some of the Declaration's assertions may give rise to an inference of *implied* confidentiality. The Supreme Court, for instance, has held that if the information was received at a place and under conditions that insured the contact itself would be secret and that circumstance is coupled with the fact that the subject informant was paid by the FBI, an implied inference of confidentiality is justified. *See Landano*, 508 U.S. at 179, 113 S.Ct. 2014.

Because neither the Moran Declaration nor the government's appellate brief addresses this alternative argument, we remand this question to the district court for its further consideration of these redactions. *See United States v. International Bhd. of Teamsters*, 12 F.3d 360, 366 (2d Cir.1993) (appellate courts ordinarily do not consider issues not raised below). On remand, the district court should afford the government an opportunity either to supplement the Moran Declaration with respect to the express assurances of confidentiality or to present, if it is so advised,

an alternative argument based on a rationale of implied confidentiality.

### 2. *Implied Confidentiality*

■ The Moran Declaration next asserts that information falling into the following categories was redacted under implied assurances of confidentiality: (1) the identities of and information provided by local and foreign law enforcement agencies; and (2) the identities of and information provided by third parties interviewed by the FBI.

*Landano* explains that, while "it is unreasonable to infer that all FBI criminal investigative sources are confidential," there may exist "more narrowly defined" though "generic circumstances in which an implied assurance of confidentiality fairly can be inferred." 508 U.S. at 179, 113 S.Ct. 2014. Among the possible circumstances are two key factors: "the nature of the crime that was investigated and the source's relation to it." *Id.* at 180, 113 S.Ct. 2014. The Court suggested, for example, that an inference of implied confidentiality would be appropriate with respect to informants who, absent confidentiality, might be worried about possible retaliation because of the subject matter. *See id.* at 179–80, 113 S.Ct. 2014.

That suggestion is particularly apt in the present case. First, the files in question pertain to FBI investigations of the alleged Communist sympathies and criminal activities of the Marches as well as of the other members of the meatpacking industry mentioned in Halpern's FOIA requests. *See id.* (citing *Keys*, 830 F.2d at 345–46). Second, foreign and local law enforcement authorities are types of sources explicitly contemplated by the text of Exemption 7(D). *See* 5 U.S.C. § 552(b)(7)(D) (noting that confidential sources include "a State, local, or foreign agency or authority .... which furnished information on a confidential basis").

Third, the Moran Declaration specifies that the third parties who provided information included

social and business acquaintances of the subjects [of investigation,] officials and employees of business and social organizations, fellow employees of the subjects, employees of businesses, and persons who provided singular and unique information regarding the activities of the subjects of these investigations.

Moran Decl. ¶ 71. Given the conditions that existed in the meatpacking industry at that time, we think these third parties are precisely those types of sources whose relation to the activities under investigation would have given them cause to fear retaliation in the event of disclosure. In light of the circumstances, it is reasonable to infer an implied assurance of confidentiality.

 In response, Halpern contends that the passage of time and, most notably, the end of the Cold War, have obviated the need for continued confidentiality. As the Supreme Court teaches, however, "[u]nder Exemption 7(D), the question is not whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential." *Landano*, 508 U.S. at 172, 113 S.Ct. 2014. Hence, it makes no difference in our analysis whether now, in hindsight, the objective need for confidentiality has diminished; what counts is whether then, at the time the source communicated with the FBI, the source understood that confidentiality would attach. *See King*, 830 F.2d at 236 (approving, where the FBI invoked Exemption 7(D) with respect to McCarthy–Era documents, the trial court's "soundly reasoned" approach of "first cultivating a vantage point contemporaneous with the interviews and then examining the relations and allegiances of those who gave the FBI information"); *Keys*, 830 F.2d at 346 ("Congress has not established a time limitation for exemption 7(D) and it would be both impractical and inappropriate for the Court to do so."); *see also Ortiz v. United States Dep't of Health & Human Servs.*, 70 F.3d 729, 733 (2d Cir.1995) (noting that the actual existence of a crime, the status of the investigation, and the passage of time are all irrelevant to the applicability of Exemption 7). *But cf. United Techs. Corp.*, 777 F.2d at 95–96 (discussing possibility of waiver).

Finally, for reasons analogous to those discussed with respect to Exemption 7(C), we decline to accept Halpern's contention that the Moran Declaration fails to meet the reasonable specificity standard for *Vaughn* affidavits. As a consequence, the FBI's invocation of implied confidentiality under Exemption 7(D) must stand.

## CONCLUSION

Accordingly, for the reasons discussed above, the judgment of the district court is affirmed with respect to the FBI's invocation of personal privacy under Exemption 7(C) and of implied confidentiality under Exemption 7(D) with respect to records compiled for law enforcement purposes. The judgment of the district court is vacated and remanded with respect to the FBI's invocation of national security under Exemption 1 and of express confidentiality under Exemption 7(D).

Affirmed in part, reversed in part, and remanded.

## APPENDIX

1. An intelligence activity or method includes any intelligence-gathering action or technique utilized by the FBI against a targeted individual or organization determined to be of national security interest.

All of the intelligence activities or methods detailed in the withheld information are currently utilized by the FBI and are effective means to gather, store or disseminate intelligence information. The criteria utilized by the FBI in these instances to decide what actions by an individual or

organization warranted the commencement of an investigation, or caused a certain activity to be given investigative attention over others, can be revealed through disclosure of these intelligence activities or methods. The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations, which are conducted in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations. The information obtained from the activities or methods is very specific in nature, provided during a specific time period, and known to very few individuals. Disclosure of the specific information which describes the intelligence activities or methods withheld in this case could reasonably be expected to cause damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discovery the current activities or methods used; (2) reveal current specific targets of the FBI's national security investigations; and (3) allow hostile entities to determine the criteria used and priorities assigned to current intelligence or counterintelligence investigations. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

2. Specific information about, or from, an intelligence activity and/or method, the disclosure of which could reasonably be expected to identify the intelligence gathering capabilities of an intelligence activity and/or method.

The FBI engages in intelligence activities and utilizes intelligence activities and/or methods to fulfill responsibilities imposed upon it by law in the intelligence and counterintelligence field. This information encompasses assessments of intelligence source penetration into particular areas of intelligence interest. The charac-

ter or degree or source coverage or penetration of targeted hostile intelligence activities and/or use of a particular method in conducting intelligence activities in these records could reasonably be expected to disclose a great deal about the scope of FBI activities, both past and present. This information could reveal a particular area of national security interests, as well as the degree of FBI knowledge of certain activities. This disclosure could reasonably be expected to provide assessment of the impact of the availability or nonavailability of intelligence sources, activities and/or methods targeted against past or present suspected intelligence during a particular period of time. This information, as it appears in the records sought by plaintiffs, is specific. Therefore, its disclosure would automatically reveal to a hostile intelligence analyst United States intelligence-gathering capabilities in a particular area, during a specific period of time.