COZEN O'CONNOR, a Professional Corporation

v.

UNITED STATES DEPARTMENT OF TREASURY.

Civil Action No. 05–4332.

United States District Court, E.D. Pennsylvania.

Aug. 7, 2008.

---

Elliott R. Feldman, Adam C. Bonin, Cozen & O'Connor, Philadelphia, PA, for Cozen O'Connor.

Elizabeth J. Shapiro, Jonathan Eli Zimmerman, U.S. Department Of Justice, Civil Division, Washington, DC, for United States Department of Treasury.

## MEMORANDUM OPINION

SAVAGE, District Judge.

### Introduction

In this action brought under the Freedom of Information Act ("FOIA"), Cozen O'Connor ("Cozen"), a law firm, requested documents regarding terrorism-related designations of eighty-seven individuals, entities and foreign states that are in the possession of the United States Department of the Treasury ("Treasury") and other government agencies.[1] Cozen seeks these documents to assist it in prosecuting civil claims against those responsible for the September 11, 2001, attacks on the World Trade Center Towers and the Pentagon.[2]

Moving for summary judgment, Treasury contends that its search, given the nature of the subject matter and the scope of the request, was adequate, and that it properly asserted the exemptions with ample descriptions of the documents it withheld. Additionally, with respect to requests concerning sixteen entities, Treasury refuses to admit or deny the existence or nonexistence of any responsive records pertaining to those entities. It asserts that the mere fact as to whether the records exist is exempt from disclosure because disclosing the existence or nonexistence of the records may indicate to one of those sixteen entities that Treasury may or may not have commenced an investigation into that entity. It emphasizes out that those charged with protecting the national security and implementing foreign policy are better equipped than the courts to evaluate the impact resulting from disclosure of the informa-

---

**1.** Some of the other government agencies are the Federal Bureau of Investigation ("FBI"); the Department of State; the Internal Revenue Service ("IRS"); Immigration and Customs Enforcement, the Department of Homeland Security ("ICE"); Customs and Border Protection, the Department of Homeland Se-

curity ("CBP"); and the United States Citizen and Immigration Services ("USCIS").

**2.** In re *Terrorist Attacks on September 11, 2001,* No. 03–md–01570 (S.D.N.Y. filed Dec. 10, 2003).

tion it withheld. It also disputes that it acted in bad faith.

Cozen counters that Treasury has not produced all documents responsive to its requests. It argues that Treasury conducted an inadequate search, improperly invoked exemptions, did not sufficiently describe withheld documents so one could determine if the asserted exemptions applied, and improperly refused to acknowledge that it did or did not have documents in certain instances. Cozen also claims that Treasury acted in bad faith as evidenced by its delay in responding and inadequate processing of the request.

After reviewing Cozen's requests and Treasury's responses, and conducting an *in camera* review of classified declarations and a complete unredacted Treasury evidentiary file, I conclude that summary judgment cannot be granted at this time. There are questions regarding the adequacy of Treasury's search. With respect to the asserted exemptions, Treasury's withholding of the documents, with the exception of a few, was proper. Therefore, summary judgment will be denied, and Treasury will be given an opportunity to explain the parameters of its search to assure that it was adequate to find responsive documents.

## I. FOIA Request

Cozen requested detailed intelligence and investigative information located in Treasury's files relating to the designations of: Iran, Iraq, Sudan and Syria as state sponsors of terrorism; specific groups and organizations engaged in terrorist activity or having the capability and intent to engage in terrorist activity or terrorism; and, individuals and organizations providing material or financial support to, or associating with, designated terrorists. It also sought the identification of assets belonging to those so designated.

The comprehensive scope of the request is set forth in Cozen's letter of July 30, 2003, which reads:

> any and all documents, including, but not limited to: intelligence and research files, terrorism intelligence summaries, narcotics intelligence summaries, security files, reports and/or summaries of terrorism/narcotics investigations, memoranda (including, but not limited to, inter and intra-office communications), white papers, correspondence, records, analyses, graphs, reports, computer generated printouts or other matter, reports of consultants, surveys and studies supporting the designation.... [3]

The documents sought by Cozen are maintained by the Office of Assets Control ("OFAC"). OFAC is a part of the Treasury's Office of Terrorism and Financial Intelligence, which was created by statute as a law enforcement organization within Treasury.[4] OFAC administers United States economic sanctions programs primarily directed against foreign states and nationals, including sponsors of global terrorism, by enforcing blocking orders, which segregate and freeze blocked assets, and by imposing certain restrictions on trade and financial transactions. OFAC administers approximately thirty economic sanctions programs, the majority of which are conducted under the authority of the International Emergency Economic Powers Act ("IEEPA") and various executive orders.[5] 50 U.S.C.A. §§ 1701–1706 (2003

3. Letter from J. Scott Tarbutton, Decl. of Virginia Canter ("Canter Decl.") at Ex. A at 1–2.

4. 31 U.S.C.A. §§ 313(a)(6), (d) (West Supp. 2008).

5. Declaration of Adam J. Szubin ("Szubin Decl.") ¶ 7. Szubin is the director of OFAC and is familiar with Cozen's FOIA request. His declaration discussed OFAC's mission and authority, OFAC's power to block assets under IEEPA, terrorism designations under

& West Supp.2008).

Pursuant to the IEEPA, the President can issue executive orders imposing economic sanctions in order to combat threats to the national security, to enforce foreign policy, and to protect the economy. *Id.* § 1701(a). One form of sanctions is the blocking of assets to prevent their use in support of global terrorists' plots.[6] The executive orders can direct the blocking of property and property interests of persons designated as terrorists or supporters of terrorism within the United States or within the possession or control of United States persons, wherever located. Blocking prevents assets from being transferred, withdrawn, exported, paid or otherwise dealt in by United States persons and entities without OFAC's prior authorization.

Before assets may be blocked, the owner must be designated by Treasury as a terrorist or a supporter of a terrorist organization. In the designation process, Treasury conducts an investigation by assembling information, classified and unclassified, from public and nonpublic sources. The evidence is summarized in an evidentiary memorandum that references the exhibits acquired during the investigation. To ensure that the designation is consistent with the operational and policy interests of other agencies as well as national security and foreign policy goals, there is inter-agency coordination in the designation process. Thus, information used in making the designation decision is generated by many agencies.

Notifying the subject of an investigation before the process is concluded could subvert the effectiveness of the sanction. In the meantime, the subject could transfer, hide, sell or destroy assets, or otherwise obstruct the investigation. As a consequence, blocking of assets could not be accomplished, frustrating OFAC's law enforcement efforts. Hence, Treasury will not release information that could reveal that a designation investigation and process is underway.

## II. FOIA Standards

Enacted to assure transparency and accountability, FOIA requires the government and its agencies to disclose information to the public upon request. 5 U.S.C.A. § 552(a)(3)(A) (2007). However, not all information must be disclosed. Recognizing that the public's right to know may be outweighed by the government's need to keep certain information confidential, Congress created nine exemptions. 5 U.S.C.A. § 552(b)(1)-(9) (2007); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 925 (D.C.Cir.2003) (citing *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989)). In the absence of an applicable exemption, the agency must disclose the requested information.

 Judicial review of an agency's decision to withhold documents is different from the review of other agency decisions.[7] The deferential substantial evidence standard does not apply. The agency's decision is reviewed *de novo,* and the burden is on the agency to prove that it properly

---

Executive Order Number 13,224, OFAC's designation process, and Treasury's claiming of Exemptions 1 and 7(A).

**6.** *See, e.g.,* Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 23, 2001), *amended by* Exec. Order No. 13,284 § 4, 68 Fed.Reg. 4075 (Jan. 23, 2003), *amended by* Exec. Order

No. 13,372 § 1, 70 Fed.Reg. 8499 (Feb. 15, 2006).

**7.** When the agency withholds requested information, the requester may seek an order from a district court enjoining the agency from withholding the records and ordering their release. 5 U.S.C.A. § 552(a)(4)(B) (2007).

withheld the records. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989); *Sheet Metal Workers Int'l Ass'n. v. U.S. Dep't of Veterans Affairs*, 135 F.3d 891, 897 (3d Cir. 1998). During the review, the statutory exemptions, in light of the strong presumption in favor of disclosure, are construed narrowly. *FBI v. Abramson*, 456 U.S. 615, 630, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982); *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1049 (3d Cir.1995).

■ When invoking an exemption, the agency must provide reasonably specific information that explains how the exemption applies. *Am. Friends Serv. Comm. v. Dep't of Defense*, 831 F.2d 441, 444 (3d Cir.1987); *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). It must describe the material being withheld, state the justification for non-disclosure, and cite each exemption asserted. *Am. Friends Serv. Comm.*, 831 F.2d at 444; *Casey*, 656 F.2d at 738. It may do so by providing a detailed affidavit or submitting a *Vaughn* index.[8] *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C.Cir.1994). Conclusory affidavits that merely recite statutory standards or are vague will not suffice. *Halpern v. FBI*, 181 F.3d 279, 293 (2d Cir.1999); *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C.Cir.1998). Because the agency has full knowledge of the contents of the withheld records and the requester has only the agency's affidavits and descriptions of the documents, its affidavits must be specific enough to give the requester "a meaningful opportunity to contest" the withholding of the documents and the court to determine whether the

exemption applies. *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C.Cir.1987).

■ The agency can meet its burden by submitting a *Vaughn* index,[9] which is a detailed affidavit correlating the withheld documents with the claimed exemptions. To pass muster, a *Vaughn* index must consist of one comprehensive document, adequately describe each withheld document or redaction, state the exemption claimed, and explain why each exemption applies. *Afshar v. Dep't of State*, 702 F.2d 1125, 1144–45 (D.C.Cir.1983) (quoting *Founding Church of Scientology, Inc. v. Bell*, 603 F.2d 945, 949 (D.C.Cir.1979)). The rule applies to each agency and does not require all agencies in the litigation to submit a joint *Vaughn* index. *Id.* at 1145. The single document rule is satisfied if the affidavits clearly link the information in each and were drafted with each other in mind. *Id.*

■ An insufficient description of withheld records may instigate *in camera* inspection to afford meaningful judicial review. *Patterson v. FBI*, 893 F.2d 595, 599 (3d Cir.1990) (stating that *in camera* review also can verify agency good faith). The affidavits themselves may be submitted *in camera* where, due to the sensitive nature of the documents, the agency is unable to sufficiently detail the records in the public affidavits. *Id.* at 599–600. Nevertheless, before submitting *in camera* affidavits, the agency must present as much as it can in a public affidavit. *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C.Cir. 1976).

■ If the agency demonstrates that the information is exempt, it is entitled to

---

8. *See infra* note 9.

9. This device is derived from *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C.Cir.1973). The *Vaughn* Court held that the specificity re-

quirement may be satisfied by a system of itemizing and indexing that correlates the government's statements in support of nondisclosure with the actual documents. *Id.*

summary judgment in its favor. *Am. Friends Serv. Comm.*, 831 F.2d at 444; *Military Audit Project*, 656 F.2d at 738. On the other hand, if the agency's explanation is contradicted by evidence in the record or if it acted in bad faith, summary judgment is inappropriate. *Am. Friends Serv. Comm.*, 831 F.2d at 444; *Military Audit Project*, 656 F.2d at 738.

### III. Adequate Search

 To prevail on summary judgment, the agency must show that its search was reasonably calculated to uncover relevant documents. *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C.Cir.2007). Conversely, the requesting party may defeat the agency's motion for summary judgment by producing evidence that raises a substantial doubt that the search was adequate. *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C.Cir.1999).

 There is no prescribed search methodology. Whether it is done manually or electronically, the search must be adequate enough to reasonably assure that all files likely to contain the requested information have been searched. *Morley*, 508 F.3d at 1120–21; *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C.Cir. 1994). Although the search need not be exhaustive, it must be adequate. In determining whether an agency's search was adequate, the test is not "whether there might exist any other documents possibly responsive to the request." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 182 (3d Cir.2007). Thus, adequacy focuses on the appropriateness of the search methods used and not on what the search produces or does not produce. *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 314 (D.C.Cir.2003).

 To support its claim that it conducted an adequate search, the agency's affidavit must (1) contain reasonable detail; (2) set forth the search terms used; (3) describe the type of search performed; and (4) confirm that all files likely to contain responsive material were searched. *Iturralde*, 315 F.3d at 314; *Valencia–Lucena*, 180 F.3d at 326; *Steinberg*, 23 F.3d at 551.

 In determining whether a search was adequate, the court takes into account the circumstances of the case. *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C.Cir.1981); *Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 834 (D.C.Cir.1979). The adequacy inquiry starts with the presumption that the agency affidavits and the related search were made in good faith. *Ground Saucer Watch*, 692 F.2d at 771. However, the good faith presumption can be overcome by contrary record evidence or evidence of bad faith. *Military Audit Project*, 656 F.2d at 738. To rebut the presumption, the requester must present more than purely speculative claims about the existence and discoverability of documents. *Ground Saucer Watch*, 692 F.2d at 771. Speculation that uncovered documents may exist is insufficient to show that the agency's search was unreasonable. *Steinberg*, 23 F.3d at 552. On the other hand, a welldefined request coupled with facts, not speculation, that indicates materials do exist and were overlooked raises a substantial doubt whether an adequate search was performed. *Iturralde*, 315 F.3d at 314.

OFAC searched evidentiary files, previously released non-classified administrative records, and its aggregate database of blocked assets. Treasury emphasizes the time spent and volumes produced in the search. These quantitative factors do not render the search adequate. Nor are they dispositive of the adequacy issue. Despite the employment of many people over a lengthy period of time and the production of a large number of documents, the

search still could be inadequate if it was not conducted properly and fully.

Cozen challenges Treasury's description of its search, claiming it did not explain how the search was conducted. It contends that the declaration of Virginia Canter, Associate Director of Research Management for OFAC, does not contain enough information regarding the file system and the breadth of the search. Specifically, Cozen argues that Canter does not specify how the database is organized or how limiting the search to entities' names would yield all responsive documents.

OFAC conducted its search in two phases. In phase one, OFAC did a page-by-page review of non-classified administrative records previously released in unrelated litigation challenging five designations under Executive Order Number 13,224.[10] It then produced those non-exempt documents or referred them to originating agencies. Phase two involved the searching of materials in Treasury's evidentiary files and aggregate database of blocked assets for additional material responsive to Cozen's FOIA request and the processing of those materials. It is the adequacy of the search in the second phase that is at issue.

In phase two, Treasury first checked to see if OFAC had designated the eighty-seven entities in Cozen's request. Treasury notified Cozen that sixteen of the entities had not been designated by any agency; and, thus, it could not confirm or deny the existence of records with respect to these entities. Also, fifteen entities were not designated by Treasury and, as a result, Treasury did not maintain evidentiary files on them. According to Canter, Treasury processed and searched the evidentiary files on the remaining fifty-two entities. Treasury also searched OFAC's aggregate database of blocked assets. The search of this particular database was adequate. However, it was searched only because Cozen specifically referred to it in its requests.[11] The question arises whether Treasury could have searched other databases or files that likely contain information regarding the entities. If there were other databases and files that could have been searched and were not, the search was inadequate.

Treasury represents that it "focused" its search in its evidentiary files pertaining to terrorism sanctions designations.[12] These files "typically" contain a memorandum and exhibits bearing on the designation decision and "usually" contain material from classified and unclassified sources within and outside Treasury.[13] Treasury asserts that a search outside evidentiary files "would not likely locate material." [14] That may be accurate. However, Treasury does not describe those other files or how it searched them, if at all, to ascertain whether they may have information. Nor does it explain why it concludes that those other files are "not likely" to contain re-

---

**10.** After the September 11, 2001, terrorist attacks, President George W. Bush signed Executive Order Number 13,224. The executive order declared a national emergency as a result of the threat to national security from terrorist attacks, and ordered the freezing of funds of individuals and entities that provide support, services, or assistance to, or otherwise associate with, terrorists and terrorist organizations designated under the Order. The Order also authorizes the Secretary of State, in consultation with the Secretary of Treasury and the Attorney General, to desig-

nate additional entities that provide material support to terrorists or terrorist organizations. Exec. Order No. 13,224, 66 Fed.Reg. 49079 (Sept. 23, 2001).

**11.** Canter Decl. ¶ 41 and Ex. A at 2.

**12.** Canter Decl. ¶ 38.

**13.** *Id.*

**14.** *Id.*

sponsive documents. Therefore, Treasury must clarify the scope of its search and, if so, verify that responsive information is not in files other than "evidentiary files."

In her declaration, Canter speaks only of "gathering" information without describing the methodology.[15] Lacking the specifics of how the search was conducted, one cannot determine whether it was reasonably calculated to discover responsive documents. It may be that Treasury's phase two search was adequate, but there is insufficient information in the record to conclude that it was. Therefore, Treasury will be given the opportunity to specify its search methodology.

## IV. Bad Faith

 Cozen alleges that Treasury acted in bad faith. While a failure to locate an identifiable document may only render the search inadequate, evidence that the agency failed to search certain offices, refused to interview officials who might have been helpful in finding the missing documents, ignored indications that documents found in its initial search pointed to additional documents elsewhere, and had reason to believe the document was in a particular file may raise a concern of bad faith. *Iturralde*, 315 F.3d at 315.

In support of its claim of bad faith, Cozen cites a Treasury press release that discusses International Islamic Relief Organization ("IIRO") and Abd Al–Hamid Sulaiman. None of the documents produced by Treasury contain information mentioned in the press release. This alleged discrepancy, according to Cozen, is indicative of an inadequate search and bad faith. Other indicators of bad faith, in Cozen's view, are: (1) the phase one production did not include documents referred to other agencies; (2) there were unexplained missing pages in the phase one

production, (3) Treasury did not produce on a rolling basis; (4) it delayed producing the Rabita Trust and Al Haramain documents that it had promised for five months; (5) it did not notify Cozen of another FOIA request for information on the Global Relief Foundation; and (6) by its own admission, it failed to locate the evidentiary file pertaining to Ramzi Binalshibh, an alleged ringleader of the 9/11 attacks.

 Where there is a claim of bad faith, each request and each response must be evaluated in light of the circumstances of the case. *See Ground Saucer Watch*, 692 F.2d at 771. Factors to consider are the nature of the documents sought, the volume of documents that must be processed, the number of agencies involved, the exemptions implicated, and the reasonableness of the search. *See id.* at 771–772.

 Failure to discover or turn over a specific document does not render the search inadequate. *Iturralde*, 315 F.3d at 315. However, failure to produce known documents specifically identified by the requester that do not show up in the search the government claims was done tends to raise a question of the agency's good faith. *Id.* at 315; *Ground Saucer Watch*, 692 F.2d at 772.

 Delays in responding to a request are not, absent evidence of bad faith, grounds for discrediting affidavits. *Iturralde*, 315 F.3d at 315. A hastily conducted process could result in the inadvertent production of classified documents or the withholding of previously classified documents that no longer should be classified. *Cf. Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C.Cir.1976); *The Wilderness Society v. U.S. Dep't of Interior*, No. 04–0650, 2005 WL 3276256, at *6 (D.D.C. Sept. 12, 2005).

---

**15.** *Id.* ¶ 29.

A careful and thorough search requires time. Consequently, a delay in processing a request will not always signal bad faith. *See Iturralde,* 315 F.3d at 315.

Here, there is no evidence of bad faith. The length of time in responding to the requests was not inordinate considering the number of agencies involved, the nature of the information sought, the volume of documents to be searched and reviewed, and the sensitivity of many of those documents. Throughout the process, even though they disagreed, the parties communicated regarding progress. Treasury did not intentionally refuse to process the requests. It sought to refine them so it could respond.

Considering the complexity of the process in this case and the large number of documents implicating several agencies, it is not surprising that the responses were not always in ideal form. Of course, the presentation could have been better. But, the fact it was not does not evidence bad faith.

Cozen argues that Treasury's delay in referring the documents to originating agencies evidences bad faith. It claims that Treasury did not refer documents to the FBI and other agencies until May 2006, despite the January 2006 scheduling order.[16] Later, Treasury requested a month extension in November 2006 because it had not received responses from other agencies.

 If an agency receives a FOIA request for a document that it received from another agency, it cannot refuse to respond and require the requester to submit a FOIA request to the other agency. *McGehee v. CIA,* 697 F.2d 1095, 1110 (D.C.Cir.1983). It must either respond directly, refer the request to the originating agency, or respond after consulting with the originating agency. *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1118 (D.C.Cir.2007). The agency may not request the originating agency to review the document to determine whether an exemption applies before responding if referral would significantly impair production or cause undue delay. *Peralta v. U.S. Attorney's Office,* 136 F.3d 169, 175 (D.C.Cir. 1998); *Sussman,* 494 F.3d at 1118. When the agency refers the record to the originating agency for a response, it still must defend the originating agency's decision to withhold the record.

With respect to information in its files that originated from other agencies, Treasury's explanation of the search process is troublesome because it leaves open whether all files were searched. Treasury sent the materials to the referring agencies with a request that they either respond directly to Cozen or return the information with appropriate FOIA responses. Canter explains that the "latter approach was usually taken with regard to classified information."[17] This carefully crafted statement fails to disclose how the other documents containing non-classified information generated by the other agencies were processed. Indeed, there is no verification that all the other agencies responded to the referrals.

---

**16.** The January 2006 scheduling order required the following: Cozen to pay Treasury $86,765.18 for initial processing fees; Treasury to inform Cozen when additional payment of fees was necessary; Treasury to produce previously released non-classified administrative records by February 17, 2006; Treasury to ascertain whether it had publicly released documents pertaining to the re-

maining eighty-seven entities and individuals; Treasury to produce non-exempt materials on a rolling basis with the full and final production by November 3, 2006; and Treasury and Cozen to provide the court with quarterly status reports starting April 1, 2006. (Document No. 21).

**17.** Canter Decl. ¶ 40.

In her declaration, Canter states that Treasury in phase one referred 3,032 pages to the originating agencies that responded directly to Cozen.[18] During phase two, Treasury focused its search in the "evidentiary files" and referred pages in those files to originating agencies with instructions "to either respond directly to plaintiff or return the information to Treasury with the appropriate FOIA responses."[19]

The FBI's declaration, prepared by David M. Hardy ("Hardy"),[20] states that on May 4, 2006, OFAC advised the FBI that it had identified and sent 2,995 pages of material.[21] The FBI responded directly to Cozen by letters dated May 4, May 15, and August 11, 2006.[22] The FBI also consulted with the Bureau of Prisons, the IRS, and the United States Postal Service on certain documents that contained information supplied by those agencies.[23]

The State Department's declaration indicates that it reviewed fifty-five documents and returned fourteen of the referred documents to Treasury because Treasury had "equities" in the documents. The State Department states that it withheld twenty-nine documents in full or in part and released two documents in full.[24] The IRS declaration states that with respect to some of the documents "it left the final decision to OFAC as to the release" of the documents.[25] It is unclear as to how the IRS responded to the request regarding the other documents.

Although there are questions regarding Treasury's referral process, there is no evidence of bad faith. Given the necessity of coordination among the various agencies and the nature of the documents to be reviewed, the time it took to process the documents referred to other agencies was not exceptionally lengthy.

## V. The Vaughn Indices

Cozen's protestations to the contrary, Treasury's *Vaughn* index is more than sufficient. With a few limited exceptions,[26] it comprehensively explains its reasons for withholding requested materials. It describes the nature of each document withheld in whole or in part, the specific exemptions asserted, and the reason for asserting each exemption. Although the reason given for invoking each exemption is not always specific, it does provide enough information, when considered with the document's description and the accompanying affidavits, to allow one to determine whether the claimed exemption applies.

The State Department explained its reasons for withholding various communications from overseas embassies and a visa report. The documents and the reasons for withholding them are more than ade-

---

18. *Id.* ¶¶ 30, 35.

19. *Id.* ¶¶ 38, 40.

20. Hardy is the FBI's Section Chief of the Record/Information Dissemination Section, which is part of the FBI's Records Management Division. His unit plans, develops, directs and manages responses to requests for access to FBI records and information pursuant to FOIA. *See* Decl. of David Hardy ("Hardy Decl.") ¶¶ 1–2.

21. Hardy Decl. ¶ 6. Treasury in total referred 3,638 pages to the FBI.

22. Hardy Decl. ¶ 7.

23. Second Hardy Decl.

24. Decl. of Margaret P. Grafeld ("Grafeld Decl.") ¶ 3. The remaining ten documents were duplicates. *Id.*

25. Decl. of Jane Loughlin ("Loughlin Decl.") ¶ 4.

26. *See* discussion *infra* VII.D and VII.G on Treasury's withholding of commercial databases and ICE's *Vaughn* index deficiencies.

quately detailed. Similarly, the IRS declaration sufficiently explains the nature of the documents or parts of documents withheld, and the reasons for withholding them.

CBP withheld portions of eighteen screen prints that contained arrival and departure information taken from travelers' I–94 forms, which were completed and submitted by travelers upon entry. The index sufficiently describes the basis for asserting each exemption.

USCIS withheld one document that contained biographical information of an individual and his family. Its index explains that the document is exempt under Exemption 6 covering personal privacy. No further information is necessary.

Treasury referred documents concerning three registered Islamic charities to the FBI. Of those 3,628 pages, the FBI withheld 178 pages in part and 960 pages in full. The FBI submitted its own *Vaughn* index and declaration to justify its withholding of those documents. In its declarations, the FBI represented that it had investigated those three organizations. The investigations, which used confidential sources and various investigative techniques, determined that the organizations were connected to terrorists. These findings were used by OFAC in deciding to freeze those organization's assets.

The FBI's declaration clearly states the justification for withholding the documents. It correlates the documents on the FBI's *Vaughn* index with the reasons given in the declaration. The FBI identified documents differently than Treasury, using different pagination. As a result, there is no correlation between the FBI and Treasury's indices because Treasury utilizes a different coding system than the FBI. There is no way to match the documents the FBI cites to the documents Treasury states it referred to the FBI. In other words, one cannot determine whether Treasury and the FBI are talking about the same documents.

Like the FBI, ICE did not correlate the documents it withheld with the documents on Treasury's *Vaughn* index. Consequently, one cannot determine if the two agencies are referencing the same documents. Additionally, the document descriptions are too broad, and the reasons for withholding merely recite statutory language. Thus, with respect to the FBI and the ICE indices, they must be amended to provide a link between the documents on those lists with the documents on Treasury's *Vaughn* index, and ICE's *Vaughn* index must adequately state its reasons for withholding documents.

## VI. Redactions

 An agency may not withhold an entire document because a part of it is exempt. 5 U.S.C.A. § 552(b) (West Supp. 2008).[27] FOIA requires an agency to redact only those parts that are exempt and to release the remaining portions of the documents. *Id.; Reporters Comm.*, 489 U.S. at 765–66, 109 S.Ct. 1468, 103

**27.** The statute regarding redactions was amended on December 31, 2007. It now requires that agencies note both "the amount of information deleted" and the exemption claimed for such deletion on the released portion of the record and at the place where such deletion is made. 5 U.S.C.A. § 552(b) (West Supp.2008); *see* Open Government Act of 2007, Pub.L. No. 110–175, § 12, 121 Stat. 2524, 2530–31 (2007). Treasury's redacted evidentiary file for Wa'el Hamza Julaidan, which was submitted after the amendment took effect, provided the exemptions claimed both on the released portion of the record and at the place the deletion was made. Whether the other agencies followed the same procedures is irrelevant because the statute was amended after Treasury filed its motion for summary judgment.

L.Ed.2d 774 (1989). It may, however, withhold parts that cannot be segregated from the whole document because the exempt and nonexempt portions are inextricably bound, and disclosure of the nonexempt parts will reveal exempt information. *Neufeld v. IRS*, 646 F.2d 661, 665–666 (D.C.Cir.1981); *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C.Cir.1977). When an agency redacts a document, it must justify its deletions as it would for an entire document in an affidavit or a *Vaughn* index. *Abdelfattah*, 488 F.3d at 186–87.

Cozen argues that Treasury did not adequately justify why it redacted certain material, claiming that Treasury has not demonstrated why segregable portions were withheld. Cozen reiterates these arguments with respect to Exemptions 1, 3, and 4. Cozen also contends that Treasury redacted material that was available publicly. Cozen makes the same arguments with respect to the exemptions invoked for the redacted records as it does for the unredacted withheld documents.

## VII. Applicable FOIA Exemptions

In many instances, Treasury asserts more than one exemption to justify withholding a specific document or part of a document. Several exemptions may apply to the same document. Where some of the asserted exemptions do not apply but others do, the document is exempt because it takes only one exemption to shield the information. Therefore, where at least one exemption covers a document, it is unnecessary to consider whether the other asserted exemptions apply. *See* 5 U.S.C.A. § 552(b); *see, e.g., Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 864 n. 19 (D.C.Cir.1981).

With respect to certain documents where Treasury asserts more than one exemption, Cozen challenges Treasury's assertions of some exemptions but not others.[28] In those instances, when the court has independently determined an asserted exemption that Cozen does not challenge applies to a document, it is not necessary to decide challenges to the remaining claimed exemptions.

### A. Exemption 1—Information Protected by Executive Order

■ An agency is not required to disclose information or records that have been ordered to be kept secret pursuant to an executive order in the interest of national defense or foreign policy and that are properly classified. 5 U.S.C.A. § 552(b)(1). To claim this exemption, the agency must demonstrate that the information is indeed classified and was properly classified in accordance with the classification procedures prescribed in the executive order. It must submit an affidavit that describes the withheld informa-

---

**28.** Cozen does not challenge Exemptions 2, 6, 7(C), 7(E), and 7(F). Nor does it challenge the FBI and State Department's use of Exemption 1; the State Department, IRS, and Treasury's invocation of Exemption 3; and the State Department and IRS's reliance on Exemptions 5 and 7(A). Treasury argues that Cozen did not challenge Exemption 7(D) for the withholding of blocked asset information. Finally, Treasury argues that Cozen did not challenge Exemption 4 for its withholding of licensing material and commercial database information, and for the State Department withholdings. But, Cozen argues that Trea-

sury's descriptions of items withheld under Exemption 4 are too vague and it did not demonstrate actual harm, and the State Department did not provide reasons for withholding the documents. Cozen's arguments with respect to Exemption 4 are addressed *infra* § VII.D. Even though Cozen has not challenged these exemptions, the court still must determine that the agency has fulfilled its obligations under FOIA. *Berger v. IRS*, 487 F.Supp.2d 482, 492 (D.N.J.2007); *Georgia-Pacific Corp. v. IRS*, 517 F.Supp.2d 65, 70 (D.D.C.2007).

tion, the justification for withholding it, and its connection to the national defense or foreign policy. *McDonnell v. United States,* 4 F.3d 1227, 1243 (3d Cir.1993).

 The agency's affidavit is accorded substantial weight regarding the classified status of a record. *Id.* Executive agencies responsible for national defense and foreign policy matters are uniquely qualified to assess the adverse consequences that may occur from disclosure. *Id.* (quoting *Salisbury v. United States,* 690 F.2d 966, 970 (D.C.Cir.1982)); *Center for Nat'l Sec. Studies,* 331 F.3d at 927 (quoting *CIA v. Sims,* 471 U.S. 159, 179, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)). Judges have neither the expertise nor the qualifications to determine the impact upon national security or international relations. *Halperin v. CIA,* 629 F.2d 144, 148 (D.C.Cir.1980). Thus, a court must not substitute its judgment for the agency's regarding national defense or foreign policy implications.

Executive Order Number 12,958,[29] as amended, currently provides the standards governing the classification of documents that implicate national security.[30] It "prescribes a uniform system for classifying, safeguarding, and declassifying national security information, including information relating to defense against transnational terrorism."[31] Section 1.1(a) sets forth the classification standards:

> (a) Information may be originally classified under the terms of this order only if all of the following conditions are met:

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order No. 13,292, § 1.1(a). Additionally, § 1.4 provides what type of information may be classified:

> [i]nformation shall not be considered for classification unless it concerns: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism; (f) United States Government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabili-

---

**29.** Exec. Order No. 12,958, 60 Fed.Reg. 19825 (Apr. 17, 1995), *amended by* Exec. Order No. 13,292, 68 Fed.Reg. 15,315 (Mar. 28, 2003).

**30.** There are three classification levels. Exec. Order No. 13,292 § 1.3(a). "Top Secret" applies to information where the unauthorized disclosure of such information reasonably could be expected to cause exceptionally grave danger to national security. *Id.*

§ 1.3(a)(1). Documents are classified as "secret" when the unauthorized disclosure of those documents could reasonably be expected to cause serious damage to national security. *Id.* § 1.3(a)(2). Documents are considered "confidential" when their disclosure could reasonably be expected to cause damage to national security. *Id.* § 1.3(a)(3).

**31.** Exec. Order No. 13,952.

ties of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism; or weapons of mass destruction.

*Id.* § 1.4.

■■■ Cozen does not challenge Treasury's assertion of Exemption 1 on a document-by-document basis. Instead, it contends that Treasury has failed to demonstrate that it complied with the requirements of the executive order. In other words, Cozen complains that it cannot, on the basis of information supplied by Treasury, determine whether the executive order authorizes the classification of any of the documents withheld under Exemption 1.

Treasury withheld evidentiary memoranda and supporting exhibits that reveal facts, analyses and conclusions used in the terrorist designation process. This information was gathered from various United States' agencies and other sources throughout the world. If this information were disclosed, it could be used to frustrate and circumvent current and future investigations of known and suspected terrorists.

The State Department and the FBI also invoked Exemption 1. The former withheld several communications received from embassies abroad. These documents, as described in Margaret Grafeld's ("Grafeld") declaration,[32] identify foreign government sources and were properly classified under the executive order. The FBI, likewise, followed the classification procedure set forth in the executive order in classifying documents it withheld under Exemption 1. Those withheld documents contain foreign government information, intelligence activities and methods, intelligence sources and foreign relations activities, all matters defined by § 1.4 of the executive order as classifiable. The agencies' classification authorities have determined that disclosure would endanger national security.[33]

Having reviewed the unclassified and classified declarations, I conclude that the requirements of the executive order have been satisfied. The information was classified by an original classification authority, is owned and under the control of the United States Government, and falls within a proper classification category as defined in § 1.4 of the executive order. Each agency's classification authority reviewed each page of each document to determine if all or part of the document could be released without endangering national security. The classification authority determined that disclosure could reasonably be expected to cause serious or exceptionally grave damage to national security. Thus, after independently assessing the nature of the material and the potential effect of its disclosure on national security, I find that Exemption 1 was properly invoked by Treasury, the FBI and the State Department.

### B. Exemption 2—Agency's Internal Rules and Procedures

■■■ Exemption 2 permits withholding of information relating solely to the agency's internal personnel rules and practices. 5 U.S.C.A. § 552(b)(2). To successfully invoke Exemption 2, the agency must demonstrate not only that the material falls within the statutory language, but also that its disclosure will risk circumvention of an agency regulation or it relates to insignificant administrative matters having

---

**32.** Grafeld is the State Department's Information and Privacy Coordinator and Director of the Office of Information Programs and Services. Grafeld Decl. ¶ 1.

**33.** Grafeld Decl. ¶¶ 9–22; Hardy Decl. ¶¶ 17–52.

no public interest. *Schwaner v. Dep't of Air Force,* 898 F.2d 793, 794 (D.C.Cir. 1990). Rules or practices that have an effect on the rights or actions of the public are not exempt. *Schiller v. NLRB,* 964 F.2d 1205, 1207 (D.C.Cir.1992). Nor are matters that generate "genuine and significant public interest" exempt. *Dep't of Air Force v. Rose,* 425 U.S. 352, 369, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). However, recognizing that almost every internal personnel rule and practice has some effect on the public, agencies are relieved of the burden of processing materials whose public effect is minimal and immaterial or concern matters in which the public has no real interest. *Schiller,* 964 F.2d at 1207; *Schwaner,* 898 F.2d at 795. Thus, where the internal material relates to an insignificant trivial matter having no conceivable public interest, the inquiry ends and the exemption applies. *Rose,* 425 U.S. at 369, 96 S.Ct. 1592.

▇▇ When disclosure of materials covering routine internal matters would enable circumvention of agency regulations, the information may be withheld. *Id.* at 369–70, 96 S.Ct. 1592; *Davin,* 60 F.3d at 1064; *Schiller,* 964 F.2d at 1207. The burden is on the agency to demonstrate how the material could be used to violate or avoid the law. *OSHA Data/CIH, Inc. v. U.S. Dep't of Labor,* 220 F.3d 153, 160 (3d Cir.2000); *Founding Church of Scientology v. Smith,* 721 F.2d 828, 831 n. 4 (D.C.Cir.1983).

▇▇ Invoking Exemption 2, Treasury redacted non-public telephone and fax numbers used by employees in performing their duties, and OFAC case assignment numbers. Likewise, the FBI deleted internal telephone and fax numbers, and confidential source identifying codes and symbol numbers. CBP withheld administrative record numbers, and database and computer codes.

There is no public interest in the employees' internal telephone and fax numbers. Publishing them could allow the public to use the numbers, interfering with the internal communications network. Having the OFAC case assignment numbers, the FBI confidential source codes and numbers, and the CBP database and computer codes, one could gain unauthorized access to the agencies' records and circumvent their regulations. Exemption 2 applies to all the redacted information withheld on this basis.

## C. Exemption 3—Statutorily Protected Materials

Exemption 3 applies to documents that are specifically exempted from disclosure by another statute. 5 U.S.C.A. § 552(b)(3). Unlike other FOIA exemptions, Exemption 3's applicability does not depend upon the contents of the documents. *McDonnell,* 4 F.3d at 1246. It is the nature of the document, not its contents, that makes it exempt. Thus, the agency need only show that the documents are within the category of documents specifically exempt from disclosure by the statute.

▇▇ There are two types of Exemption 3 statutes, one is non-discretionary and the other discretionary. The former categorically mandates that specified materials be withheld, leaving the agency no discretion. The latter type establishes particular criteria for withholding the materials or permits the agency to exercise discretion in assessing whether the materials can be disclosed. *Sims,* 471 U.S. at 167, 105 S.Ct. 1881. When a statute allows an agency to exercise discretion, the agency must provide guidelines for the exercise of that discretion. *Id.* at 167, 105 S.Ct. 1881; *South Hills Health Sys. v. Bowen,* 864 F.2d 1084, 1089 & n. 3 (3d Cir.1988).

Cozen, apparently recognizing the statutory ban on disclosure imposed by the

Bank Secrecy Act[34] and the Internal Revenue Code,[35] does not question Treasury's withholding reports submitted under the former statute nor the IRS's refusing to release third parties' tax returns. It does challenge the FBI's withholding of one document as grand jury material.

Grand jury materials that would reveal the nature of the grand jury's investigation are secret pursuant to Rule 6 of the Federal Rules of Criminal Procedure. Rule 6(e) is a statutory mandate that automatically invokes Exemption 3. *McDonnell*, 4 F.3d at 1247 (quoting *Am. Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C.Cir. 1978)). It is not discretionary. The cloak covers not just grand jury transcripts, but all matters that could tend to reveal what occurred or was occurring in the grand jury, including identities of witnesses, questions asked by prosecutors or grand jurors, testimony of witnesses, or anything that could reveal the course of the investigation. Fed.R.Crim.P. 6(e); *McDonnell*, 4 F.3d at 1246; *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 869 (D.C.Cir.1981); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 n. 36 (D.C.Cir.1980).

■■■■ Just because information was either obtained by a grand jury subpoena or was submitted to a grand jury does not make it exempt. *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 584 (D.C.Cir.1987). To be exempt, the information must reveal some aspect of the grand jury's investigation. *Id.* Additionally, the connection to the investigation must be apparent, especially for documents created independent of and extrinsic to the grand jury investigation. *Washington*

*Post Co. v. U.S. Dep't of Justice*, 863 F.2d 96, 100 (D.C.Cir.1988). Lacking this connection, the information must be disclosed.

■■■■ Cozen does not claim that the document withheld by the FBI under Exemption 3 is not protected grand jury material. Rather, it contends Treasury has not adequately described the document so that one could determine whether it qualifies as secret grand jury information. The document is an intra-agency communication of information provided pursuant to a grand jury subpoena. Identifying what information was produced in response to a grand jury subpoena certainly would reveal what the grand jury was investigating. Thus, Exemption 3 was properly invoked.[36]

### D. Exemption 4—Commercial or Privileged Information

Exemption 4 protects privileged or confidential information supplied to an agency by third parties that contains commercial or financial information, or trade secrets. 5 U.S.C.A. § 552(b)(4). The information covered by this exemption is generated by third parties who provided it to the agency because they were required or requested to do so. *Judicial Watch, Inc., v. FDA*, 449 F.3d 141, 148 (D.C.Cir.2006). Hence, unlike most information subject to an agency's control, materials implicating Exemption 4 are not developed within the agency. *Id.*

■■■■ To qualify as Exemption 4 material, the information must: (1) be either trade secrets, or commercial or financial information; (2) have been obtained from some source outside the agency; and (3) qualify as privileged or confidential. 5 U.S.C.A. § 552(b)(4). The exemption protects both the interest of the government

---

**34.** 12 U.S.C.A. §§ 1951–1959 (2001 & West Supp.2008).

**35.** I.R.C. §§ 1–9833 (West 2002 & West Supp. 2008).

**36.** Not only does the information relate specifically to a grand jury investigation, it is covered by Exemption 1.

in garnering useful information and the interest of those submitting data in preventing competitive disadvantages that could result from dissemination of the information. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 877 (D.C.Cir.1992). In essence, the inquiry is whether disclosure of material generated by the third party will discourage or curtail future reliable submissions. *Critical Mass,* 975 F.2d at 878 (citing *Washington Post Co. v. U.S. Dep't of Health and Human Serv.,* 690 F.2d 252, 268–269 (D.C.Cir.1982)).

■■■ Exemption 4 applies only to commercial or financial information and trade secrets that are privileged and confidential and provided to the agency by a person outside the government. *Gulf & Western Indus., Inc. v. United States,* 615 F.2d 527, 529 (D.C.Cir.1979). Information generated by the federal government is not included. *See* 5 U.S.C.A. § 551(2) (2007); *Fed. Open Mkt. Comm. v. Merrill,* 443 U.S. 340, 360, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). However, information derived from another government agency may fall under Exemption 5.[37] *Fed. Open Mkt. Comm.,* 443 U.S. at 360, 99 S.Ct. 2800. Agency summaries of information obtained from a person outside of the government that meet the requirements of Exemption 4 are exempt. *OSHA Data,* 220 F.3d at 162 n. 23; *Gulf & Western Indus.,* 615 F.2d at 529–30. For example, if a Treasury employee received a licensing application and then summarized the information contained in that application in an internal memo, the commercial and financial information within that memo is exempt even though the document was created by an employee of the federal government. *See, e.g., Gulf & Western Indus.,* 615 F.2d at 529–30.

■■■ For purposes of Exemption 4, the test of confidentiality differs depending upon whether the information was required by, or was voluntarily provided to, the agency. *Critical Mass,* 975 F.2d at 879. Compelled commercial or financial information is confidential for purposes of Exemption 4 if its disclosure is likely to either significantly impair the government's ability to obtain similar information in the future or cause substantial harm to the competitive position of the provider of information. *Id.* at 878 (citing *Nat'l Parks and Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974)).[38] The agency's ability to carry out its statutory purpose is impaired, if disclosure of the information affects the quality or reliability of future submissions. *Judicial Watch, Inc. v. Export–Import Bank,* 108 F.Supp.2d 19, 30 (D.D.C.2000). Conversely, if disclosure of the information will not affect the agency's ability to receive reliable information in the future, it is only confidential if its release would cause substantial competitive harm to the provider of that information. *See Ctr. to Prevent Handgun Violence v. U.S. Dep't of Treasury,* 981 F.Supp. 20, 23 (D.D.C.1997). The provider need not show actual competitive harm. *Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1291 (D.C.Cir.1983). Evidence of actual competition and a likelihood of substantial competitive injury by use of the information by competitors is sufficient. *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1152 (D.C.Cir.1987); *Pub. Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1291 (D.C.Cir.1983).

**37.** Exemption 5 withholds from disclosure inter-agency and intra-agency communications that would not be discoverable in litigation with the agency. *See infra* § VII.E.

**38.** *Critical Mass* affirmed *National Parks'* two-part test for confidentiality in instances when the agency required the submitter of information to provide records. *Critical Mass,* 975 F.2d at 880. However, *Critical Mass* adopted a new test for confidentiality for information voluntarily submitted. *Id.* The test will be discussed in this section.

 The agency, not the provider, determines whether disclosure will cause impairment. *See, e.g., Hercules, Inc. v. Marsh,* 839 F.2d 1027, 1030 (4th Cir.1988); *McDonnell Douglas Corp. v. U.S. Dep't of Air Force,* 215 F.Supp.2d 200, 206 (D.D.C. 2002) ("The agency from which disclosure is sought is in the best position to determine whether an action will impair its information gathering in the future."). Providers of information cannot prevent disclosure. *McDonnell Douglas Corp.,* 215 F.Supp.2d at 206. However, they are not shut out of the process. Executive Order Number 12,600 requires an agency to give the provider of the requested information an opportunity to show what potential competitive harm would result from disclosure. Exec. Order No. 12,600, 52 Fed. Reg. 23781 (June 23, 1987).[39] The test is not one of certainty, but of probability. *Pub. Citizen,* 704 F.2d at 1291.

 The disclosure of voluntarily submitted information is more restrictive. Release of such information could jeopardize the government's ability to obtain similar information in the future from the same source or of a similar type if provid-

ers feared competitors getting the information. *Critical Mass,* 975 F.2d at 879. In other words, providers would be reluctant to voluntarily hand over competitive information, thus impairing the government's ability to obtain complete and accurate information. *Id.* Given this concern, to justify withholding the information, the agency need only demonstrate that the financial or commercial information voluntarily provided is the kind that the provider would not customarily release to the public. *Baker & Hostetler LLP v. U.S. Dep't of Commerce,* 473 F.3d 312, 320 (D.C.Cir.2006); *Critical Mass,* 975 F.2d at 879.

Cozen argues that Treasury has not adequately described the documents it withheld as commercial information and has not demonstrated how disclosure of that information would cause actual harm. It objects to the indefiniteness of the descriptions of "commercial databases" and "blocked asset reports," but does not question the descriptions of the other documents Treasury listed under Exemption 4. For example, Cozen does not claim that matters relating to licensing applications [40] are insufficiently described.

---

**39.** Executive Order Number 12,600 directs the head of each agency to establish pre-disclosure notification procedures under FOIA to notify submitters that requests have been made for records that contain confidential commercial information. They are given an opportunity to inform the agency of their positions. Exec. Order No. 12,600, at § 1. While Executive Order Number 12,600 specifically requires that the agency notify submitters of compelled information, agencies have traditionally provided this opportunity to submitters of voluntary information. U.S. Dep't of Justice, Office of Info. and Privacy, Freedom of Info. Act Guide, Exemption 4 (2004), *available* at http://www.usdoj.gov/oip/foi-act.htm (last visited Aug. 6, 2008).

**40.** OFAC issues either general or specific licenses to authorize activities otherwise pro-

hibited by the sanctions regulations. General licenses authorize a particular category of conduct and are published in the Code of Federal Regulations. Specific licenses are granted on a case-by-case basis to an individual or entity allowing that individual or entity to engage in conduct or receive payment from a prohibited transaction. To obtain a specific license, the applicant must submit a license application, among other documents that provides detailed information about the entity and the transaction. It is a tool used by OFAC to monitor the organization and the transactions. Fed. Fin. Inst. Examination Council, Bank Secrecy Act/Anti–Money Laundering Examination Manual, Office of Foreign Assets Control—Overview 137 (2006), *available at* http://www.ustreas.gov/offices/enforcement/ofac/civpen/ofac___sec___frb___080106.pdf (last visit Aug. 1, 2008).

The "commercial databases" are not defined in the *Vaughn* index or the declaration. However, for reasons cited in its invocation of Exemption 7(E),[41] Treasury withheld any further identification. Although this description may be inadequate in assessing the propriety of Exemption 4, it may be excused under 7(E), which will be discussed later.

As to the harm requirement, all but one of the providers of the databases objected to their release because the information was confidential business information "normally provided exclusively to paying customers of the commercial database operators and is not allowed to be redistributed."[42] Treasury then determined that release would cause "substantial competitive harm" to those operators. There is no basis for this conclusion. What the providers appear to say is that they want to be paid for the redistribution. They do not even suggest that disclosure would cause competitive harm. Therefore, unless Treasury provides an adequate description of the databases qualifying them for exemption under 7(E), they must be released.

■ The blocked asset information was supplied by holders of blocked property pursuant to a regulation that explicitly designates the reports as "privileged and confidential." 31 C.F.R. § 501.603(a)(2). Financial institutions submitted these reports under an assurance of confidentiality. Most of them objected to the release of the information because it would discourage customers from doing business with them if it became known that the institutions did not maintain confidentiality. Not only would disclosure adversely affect the banks, it would alert terrorist financiers to avoid those financial institutions that report to Treasury. Therefore,

the blocked asset information was properly withheld.

Cozen also challenges the State Department's withholding of one document under Exemption 4. Because that document, a telegram from an embassy discussing information received from confidential sources regarding local commercial organizations' links to Osama Bin Laden,[43] is exempt under Exemption 1, there is no need to consider Exemption 4's applicability.

Cozen does not object to Treasury's withholding materials related to licensing applications submitted by persons or entities seeking permission to engage in activities that are prohibited by sanctions regulations. The applications contain information regarding the applicant's proposed commercial transactions. Revelation of the contents could cause competitive harm because the applicant's business plan and financial strategies would be exposed. Hence, even if Cozen had objected, the licensing applications need not be disclosed.

### E. Exemption 5—Non–Discoverable Inter–Agency and Intra–Agency Privileged Communications

■ Exemption 5 withholds from disclosure inter-agency and intra-agency communications that would not be discoverable in litigation with the agency. 5 U.S.C.A. § 552(b)(5); *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). Designed to protect the decision-making processes of governmental agencies, the exemption applies to documents that are privileged in the civil discovery context, such as communications protected by the attorney-client, work product and

**41.** *See* discussion *infra* § VII.G.

**42.** Canter Decl. ¶ 70.

**43.** Grafeld Decl. ¶ 73.

deliberative process privileges. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149–150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

■ The deliberative process privilege shields predecisional confidential intra-agency advisory opinions that reflect the consultative functions of the government. *Id.* at 150, 95 S.Ct. 1504. Without protection from disclosure, officials would be reluctant to freely exchange ideas and proposed policies. *Klamath*, 532 U.S. at 8–9, 121 S.Ct. 1060; *Wolfe v. Dep't of Health and Human Serv.*, 839 F.2d 768, 776 (D.C.Cir.1988). Thus, the privilege fosters open and frank discussion among those who contribute to and make decisions. *Klamath*, 532 U.S. at 8–9, 121 S.Ct. 1060.

■ To invoke the deliberative process privilege, the agency need not identify the specific policy decision related to the document. *Sears, Roebuck*, 421 U.S. at 153 n. 18, 95 S.Ct. 1504. The privilege turns on the process, not the result. Documents may be privileged even though the recommendations and discussions contained in them did not result in final action or decision. *See id.* Consequently, even though the process does not result in a final decision, the documents generated during that process are exempt.

■ The deliberative process privilege goes to conceptualizing and not to the gathering of facts. Documents that contain only factual material, even though used in the deliberative process, must be disclosed. *Wolfe*, 839 F.2d at 774 (citing *Mead Data Cent.*, 566 F.2d at 256). However, when factual material exposes the deliberative process, it can be withheld unless the agency can redact the exempt material without revealing the thought process. *Id.*

■ The exemption shields only predecisional communications that disclose the deliberative process. *Sears, Roebuck*, 421 U.S. at 151–52, 95 S.Ct. 1504. Post-decisional communications that explain decisions are not exempt. *Id.* Given this distinction, Exemption 5 permits the withholding of documents that reflect the thought process in developing law and policy, but requires disclosure of all opinions and interpretations implementing the agency's law and policy. *Id.* at 152–53, 95 S.Ct. 1504. Once an agency references or inserts a document into a final opinion, the document loses its exempt status unless it is exempt under another exemption. *Id.* at 161, 95 S.Ct. 1504.

Citing Exemption 5, Treasury withheld draft versions of evidentiary memoranda, personal notes, and inter-agency documents containing pre-decisional analyses and discussions provided to OFAC in its decision-making. It claims that the information is protected by the deliberative process privilege. Cozen contends Treasury has not provided sufficient information regarding the nature of the documents and the process in which they were developed to make a determination that the privilege applies. It suggests that the *Vaughn* index must include the same detailed information that is ordinarily included in a privilege log in civil discovery.

All the exhibits withheld under Exemption 5 are covered by Exemption 1. Because Treasury properly withheld these documents under Exemption 1, it is not necessary to analyze the applicability of Exemption 5. Nevertheless, the *Vaughn* index indicates that the documents or redactions do reflect the deliberation process and are covered by Exemption 5.

There is ample information showing that the Treasury materials were the type produced during the decision-making process. There were drafts of documents and reports of discussions leading up to the decisions to designate entities as terrorist organizations. These documents are covered by Exemptions 1, 2, 6 and 7(C). Some of

them are also covered by Exemptions 4, 7(A), 7(D) and 7(E).

The FBI withheld a draft of a probable cause affidavit in support of a warrant to seize the assets of a suspected terrorist organization. It was not signed, notarized or filed with a court. The FBI declaration coyly concludes that "absent confirmation" that the affidavit was ever signed, it is a draft. The FBI is certainly in a position to determine if it was signed. If a final version was actually filed, Treasury must produce that final version unless another exemption applies. In the meantime, the FBI must demonstrate that it searched its records to determine if the warrant was ever signed and issued. Even if it was, Exemption 7(D) may shield the document.

The document withheld by the State Department, a telegram from an embassy, has already been determined to be exempt under Exemption 1. Hence, there is no need to consider whether Exemption 5 also applies to it.

Cozen argues that Treasury failed to demonstrate the harm to the deliberative process that would result from disclosure. Because these documents have been classified under an executive order and they are covered by Exemption 1, harm to national security has been demonstrated. Additionally, disclosure would negatively affect Treasury's decision-making in the designation process. *Hall v. U.S. Dep't of Justice,* 552 F.Supp.2d 23, 29 (D.D.C.2008) (quoting *Mead Data Central,* 566 F.2d at 258). Thus, with the exception of the probable cause affidavit draft, the documents withheld under Exemption 5 need not be produced.

### F. Exemption 6—Personal Privacy

■ Exemption 6 covers personnel, medical and similar files where disclosure would invade personal privacy. 5 U.S.C.A. § 552(b)(6). The exemption protects "individuals from the injury and embarrass-

ment that can result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Washington Post Co.,* 456 U.S. 595, 599, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982); *Sheet Metal Workers,* 135 F.3d at 897.

The focus of the exemption is the individual's interest, not the government's. During information gathering and compilation, government agencies may coincidentally receive personal and private information that has no bearing on their decision-making or operations. In those instances, the relationship of the information to the individual is not pertinent to the government's workings. Thus, exposing the individual's private and confidential information would serve no legitimate purpose under FOIA sufficient to warrant invading the individual's privacy.

■ Not all personal information is exempt. *U.S. Dep't of Defense v. Fed. Labor Relations Auth.,* 510 U.S. 487, 496, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994); *Rose,* 425 U.S. at 372, 96 S.Ct. 1592; *Sheet Metal Workers,* 135 F.3d at 897. There may be a need to disclose the information to explain the agency's operations. *Sheet Metal Workers,* 135 F.3d at 897. The individual's information may implicate the government's action that is at issue. In that instance, the public interest in disclosure might outweigh the person's expectation of privacy. *See Reporters Comm.,* 489 U.S. at 773, 109 S.Ct. 1468.

■ Applicability of the exemption does not depend on the kind of file in which the information is contained. Rather, it covers records that can be identified as applying to a particular individual. *Washington Post,* 456 U.S. at 602, 102 S.Ct. 1957; *Sheet Metal Workers,* 135 F.3d at 897 (citing *Reporters Comm.,* 489 U.S. at 762–63, 109 S.Ct. 1468). The agency has a duty to go through each document to see if the exemption applies. For exam-

ple, the agency cannot withhold all documents because they were contained in a file labeled "medical records." The exemption applies only to confidential information. Consequently, Exemption 6 does not protect non-confidential information contained in personnel, medical, or similar files. *Washington Post*, 456 U.S. at 601, 102 S.Ct. 1957.

Treasury, the FBI, the State Department, the CBP, and the USCIS redacted from various documents personal identifying information of persons incidentally mentioned—employees, sources, suspects, and a cooperating witness. There is no public interest in this information. Indeed, Cozen has not questioned the assertion of Exemption 6.

### G. Exemption 7—Law Enforcement Records

■ Exemption 7 protects law enforcement records where disclosure would result in a statutorily specified harm. 5 U.S.C.A. § 552(b)(7); *John Doe Agency*, 493 U.S. at 156, 110 S.Ct. 471. The agency must demonstrate for each withheld record that both the information was compiled for a law enforcement purpose and its disclosure would produce at least one of the six harms enumerated in the statute. *John Doe Agency*, 493 U.S. at 153, 156, 110 S.Ct. 471; *Davin*, 60 F.3d at 1054.

■ The exemption is not limited to documents involving criminal proceedings nor is it confined to information held by traditional law enforcement agencies. *Davin*, 60 F.3d at 1054 n. 3. It includes material developed during national security intelligence investigations, and extends to agencies that are not engaged in traditional law enforcement but have some law enforcement duties, such as the Equal Employment Opportunities Commission, the IRS, and the National Labor Relations Board. *Id.* Where the agency is not typically involved in law enforcement, it must

prove that the records it withheld were compiled for enforcement purposes. *Id.*

OFAC is considered a law enforcement agency. It is a part of Treasury's Office of Terrorism and Financial Intelligence, which has been statutorily designated as a law enforcement agency. 31 U.S.C.A. §§ 313(a)(6), (d).

■ To successfully invoke Exemption 7, the law enforcement agency must demonstrate that the documents are related to the enforcement of federal laws or to the maintenance of national security, and the information is rationally related to the agency's enforcement authority. *Abdelfattah*, 488 F.3d at 184. Merely reciting statutes, orders and public laws is insufficient to demonstrate a rational connection to a legitimate law enforcement concern. *Id.* at 186 (quoting *Davin*, 60 F.3d at 1056).

■ Even if it had not originally been compiled during an investigation, the information may still be considered gathered for a law enforcement purpose if it later became part of the agency's investigation. *John Doe Agency*, 493 U.S. at 155, 110 S.Ct. 471. In other words, the records qualify as law enforcement documents if they were used in an investigation by the time the FOIA request was made. *Id.*

■ The investigation need not have resulted in a criminal prosecution or other enforcement proceeding. *Davin*, 60 F.3d at 1055 (quoting *Pratt v. Webster*, 673 F.2d 408, 420–21 (D.C.Cir.1982)). It is sufficient that the investigation was to determine if a violation of a law may have occurred. *Id.* Thus, an agency need not identify a particular individual or incident as the object of an investigation into a potential violation of law or security risk. *Abdelfattah*, 488 F.3d at 186.

Once it is established that the records were compiled for a law enforcement purpose, the next step is to determine wheth-

er any of the enumerated harms would result from disclosure. The specified harms are: (1) interference with an investigation; (2) deprivation of the right to a fair trial or adjudication; (3) invasion of personal privacy; (4) disclosure of confidential sources; (5) disclosure of investigative techniques and guidelines; and (6) danger to an individual. 5 U.S.C.A. §§ 552(b)(7)(A)-(F).

**Exemption 7(A)—Interference with Investigation**

■ Exemption 7(A) shields law enforcement records relating to ongoing or prospective investigations where release could interfere with enforcement proceedings. 5 U.S.C.A. § 552(b)(7)(A). To fit within Exemption 7(A), the government must show that (1) there is a pending or prospective law enforcement proceeding and (2) the release of the information could reasonably be expected to cause some articulable harm to the investigation or proceeding. *Manna v. U.S. Dep't of Justice,* 51 F.3d 1158, 1164 (3d Cir.1995).

■ The agency may consider the requester's identity when determining whether the release of the information could reasonably be expected to cause some articulable harm. *Id.* at 1164–1165. Even if the requesting party is not the target of the investigation, disclosure could create potential harm to the investigation, such as the danger of witness intimidation, the witness's desire to maintain confidentiality, and a concern that premature disclosure would create a chilling effect on potential witnesses and lose sources of information. *See id.* at 1165.

■ Exemption 7(A) does not require a showing in a *Vaughn* index that each individual document would cause an interference with an enforcement proceeding. *Church of Scientology v. IRS,* 792 F.2d 146, 152 (D.C.Cir.1986). Harm may be presumed from the nature of the document. Put another way, certain categories of documents may be withheld without the agency having to show particularized justification. *Reporters Comm.,* 489 U.S. at 776, 109 S.Ct. 1468; *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 223, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). Distinguishing the language in Exemption 7(A) from the language used in Exemptions 7(B), (C), and (D), the Supreme Court concluded that the phrase "enforcement proceedings" used in Exemption 7(A) allows for agencies to exclude documents based on categories versus requiring justification for each individual document. *Reporters Comm.,* 489 U.S. at 777, 109 S.Ct. 1468 (reaffirming *Robbins Tire & Rubber* and holding that agencies may also exclude documents based on categories under Exemption 7(C)). Hence, where a document falls into a category of documents that are presumed harmful if disclosed, the agency need not specify the harm that would result from disclosure.

■ Cozen claims Treasury is withholding documents under Exemption 7(A) relating to two entities that no longer exist and, therefore, its assertion that the documents are related to ongoing or pending investigations of those entities is groundless. Treasury responds that the documents withheld are in "evidentiary files containing, or affected by, a pending delisting petition."[44] A delisting petition is instigated by an entity seeking to be removed from the list that designates persons or entities as terrorists or terrorism supporters.

Treasury is entitled to invoke the protection of its evidentiary files developed in preparation for the presentation of its case in the delisting proceeding. On the other hand, materials submitted by the petition-

**44.** Mem. in Supp. of Def.'s Mot. for Summ. J. 70.

er should not be entitled to the same protection. Treasury argues that disclosure would have a chilling effect on petitions. It is doubtful that an entity seeking delisting would be deterred from filing because its submissions might be disclosed to the public. Furthermore, Treasury has no interest in protecting those whom it has designated as involved in terrorism. Nevertheless, the petitioner's presentation would necessarily discuss information that Treasury developed during its designation process, revealing how, what, when and from whom Treasury garners information. Therefore, Treasury is entitled to withhold those materials.

ICE withheld documents as related to an ongoing criminal investigation. Provided ICE can cure its *Vaughn* index deficiencies, *see supra* § V, such documents may be exempt.

### Exemption 7(C)—Law Enforcement Records and Personal Privacy

█ Where the production of law enforcement records or information could invade personal privacy, the material is exempt from disclosure. 5 U.S.C.A. § 552(b)(7)(C). Exemption 7(C) is broader than Exemption 6. *Reporters Comm.*, 489 U.S. at 756, 109 S.Ct. 1468. To justify withholding information under Exemption 6, the invasion of privacy must be "clearly unwarranted." *Id.* Exemption 7(C)'s language is more lenient, requiring only a reasonable expectation of an invasion of privacy. Consequently, law enforcement records that are exempt under Exemption 6 will always be exempt under Exemption 7(C). *Id.* at 756 n. 9, 109 S.Ct. 1468. On the other hand, not all information exempt under Exemption 7(C) will be exempt under Exemption 6.

█ The requester must provide a reason for requesting the information. *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 172, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). The requester must show: (1) a significant public interest in disclosure of the information, and (2) how the information is likely to advance that interest. *Id.* The pivotal question is whether the material sought will reveal either how the agency conducted itself or something about the individual's personal information. *Reporters Comm.*, 489 U.S. at 772, 109 S.Ct. 1468. In other words, the focus is on what the agency did with the information, not on what the information is. Thus, the determination of whether the exemption applies turns on whether the individual's privacy interest outweighs the right to know what the government is doing. *Id.*

The information that Treasury, FBI and CBP withheld under Exemption 7(C) is the same information they withheld under Exemption 6. The IRS withheld the personal information of a third-party witness assisting the IRS in an investigation, and ICE redacted the names of ICE agents and third parties. There is no public interest in this information. In any event, Cozen has not challenged the assertion of 7(C).

### Exemption 7(D)—Confidential Sources

█ Exemption 7(D) protects the identity of a confidential source or information furnished by a confidential source in the course of a criminal or national security intelligence investigation. 5 U.S.C.A. § 552(b)(7)(D). To withhold information under this exemption, the agency must demonstrate that the information was provided: (1) by a confidential source; (2) to a law enforcement agency; and (3) during a criminal or national security investigation. The government's interest is its ability to continue obtaining information about illegal activity that it could not get without confidential sources. *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 178, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). Reveal-

ing sources would have a chilling effect on this investigative device. *Id.*

 The source must have provided the information with an express or implied understanding of confidentiality for it to fall under Exemption 7(D). *Id.* at 171, 113 S.Ct. 2014. An implied assurance of confidentiality may arise from the nature of the criminal activity, the source's relationship to that activity, and the persons implicated in it. *Id.* at 179, 113 S.Ct. 2014. Thus, whether the source is confidential depends upon the expectation of the source, and not that of the law enforcement agency. *Id.* at 174, 113 S.Ct. 2014. When these circumstances show that the source would not want his identity revealed, the government is entitled to a presumption of confidentiality. *Id.* at 180, 113 S.Ct. 2014. Additionally, by providing the nature of the crime and the witness's relation to the crime, the requester will have a "realistic opportunity to develop an argument that the circumstances do not support an inference of confidentiality." *Id.* Consequently, the agency must describe the crime and the source's connection to it so one can determine if the exemption has been properly invoked.

 Treasury withheld witness statements, accounts of meetings with witnesses and sources, reports and other material provided by domestic and foreign governmental sources in connection with terrorism-related sanctions investigations. Cozen claims that such information does not by its nature alone give rise to an implied promise of confidentiality. It argues Treasury must demonstrate that its sources gave up information with an understanding that it was confidential. Without such a demonstration, Cozen contends, the court cannot conclude that a grant of confidentiality would have been necessarily inferred.

One cannot seriously argue that anyone providing information in the investigation of terrorist organizations and activities would not expect that his identity as a source would be kept secret. Thus, the information withheld under Exemption 7(D) was given with an explicit or implicit promise of confidentiality.

The FBI withheld documents whose disclosure would reveal the identities of sources, including informants, foreign law enforcement entities, cooperating witnesses and foreign commercial institutions. Informants and cooperating witnesses provide information with an express understanding that their identities will remain confidential.

Foreign law enforcement agencies and commercial institutions expect to be treated as confidential. Otherwise, they would not freely provide the information. Any chance that their identities might be disclosed from the materials would discourage, if not stop, the flow of this valuable investigative information. Consequently, any material that identifies sources, directly or indirectly, may be redacted from otherwise discoverable documents.

**Exemption 7(E)—Investigative Techniques and Guidelines**

 Exemption 7(E) covers law enforcement records or information disclosing techniques, procedures and guidelines for law enforcement investigations or prosecutions that would enable unauthorized persons to circumvent the law. 5 U.S.C.A. § 552(b)(7)(E). This exemption is construed literally. *Ferri v. Bell,* 645 F.2d 1213, 1223 (3d Cir.1981).

 The exemption does not apply to routine techniques and procedures that are already known to the public, such as ballistic tests, fingerprinting, and other scientific tests. *Davin,* 60 F.3d at 1064 (quoting *Ferri,* 645 F.2d at 1224). It only applies to records that may disclose a technique not

commonly known. *Ferri*, 645 F.2d at 1223.

Treasury withheld material regarding government and non-government databases and information services arguing that disclosing them would reveal how the government uses this information in its investigations. It claims that the information reveals the "when, how, and to what extent Treasury relies on certain databases as part of its investigations." [45]

It also withheld information exchanged between Treasury and both domestic and foreign government contacts. This material contains information regarding the timing and the level of governmental cooperation. Terrorist organizations and hostile nations could avoid or misdirect Treasury's sanctions investigations and implementation if they knew what databases and what government sources were being used to gather information about them.

Cozen has not questioned the assertions of Exemption 7(E). Nevertheless, subject to the reservations regarding the commercial databases expressed in the section on Exemption 4, Exemption 7(E) applies to the databases and information services withheld.

### Exemption 7(F)—Danger to Persons

■■■■ Exemption 7(F) applies where the release of law enforcement material could endanger the life or physical safety of an individual. 5 U.S.C.A. § 552(b)(7)(F). For this exemption to apply, the agency must prove that: (1) there is a threat to a person or class of persons and (2) a connection between disclosure and the possible harm. *Ruston v. Dep't of Justice*, No. 06–0224, 2007 WL 809698, at *6 (D.D.C.

Mar. 15, 2007). The exemption not only protects law enforcement personnel or other specified third parties, but any individual reasonably at risk of harm. *Id.* Thus, the word "any individual" is given a broad interpretation. *Manna*, 815 F.Supp. at 810.

■■■■ ICE redacted from documents the names and personal identifiers of its agents and sources to protect them from retribution. These persons are involved in ongoing criminal investigations of terrorist activities. Under the circumstances, this information is covered by Exemption 7(F) as well as exemptions 7(A) and 7(D).

### VIII. Glomar Responses

■■■■ Where acknowledging that specific records exist would reveal exempt information, an agency may make a *Glomar* response, stating in an affidavit that it can neither confirm nor deny the existence of a record.[46] *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 834 n. 9 (D.C.Cir.2001) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 n. 8 (D.C.Cir.1995)). In its *Glomar* response, the agency must cite the exemptions it asserts and provide sufficient information for the court to determine whether the *Glomar* response is justifiable. *Hunt v. CIA*, 981 F.2d 1116, 1118 (9th Cir.1992); *Phillippi*, 546 F.2d at 1013. Hence, the agency's affidavit must describe in as much detail as possible why it can neither admit nor deny the existence of the records. *Phillippi*, 546 F.2d at 1014–1015.

■■■■ The court may examine classified affidavits *in camera* if the public rec-

---

**45.** Canter Decl. ¶ 86.

**46.** The term "Glomar response" comes from *Phillippi v. CIA*, 546 F.2d 1009 (D.C.Cir.1976) in which the CIA refused to admit or deny its connection to a ship called the "Glomar Explorer." *Lame v. U.S. Dep't of Justice*, 654

F.2d 917, 921 (3d Cir.1981); *Coleman v. Lappin*, No. 06–2255, 2007 WL 1983835, at *3 (D.D.C. July 3, 2007). The *Phillippi* court determined that acknowledging any information regarding a possible CIA connection to the ship was itself exempt. *Lame*, 654 F.2d at 921.

ord is not sufficient to justify the *Glomar* responses. *Id.* at 1013. When describing why a *Glomar* response is necessary would reveal the information the agency seeks to withhold, the agency is permitted to submit a more detailed affidavit for *in camera* inspection. *Patterson v. FBI,* 893 F.2d 595, 599 (3d Cir.1990); *Phillippi,* 546 F.2d at 1013. This device is often used in cases involving national security. *Patterson,* 893 F.2d at 600 n. 9. However, before considering *in camera* affidavits, the court must ensure that the public record is as complete as possible. *Id.* at 599.

Asserting that disclosing whether documents exist or do not exist would reveal whether Treasury had begun or had conducted an investigation into sixteen of the entities identified by Cozen, Treasury refused to admit or deny that it had responsive documents pertaining to them. Treasury relies on Exemptions 1 and 7(A) to utilize the *Glomar* responses as well as § 3.6(a) of Executive Order Number 13,-292.[47] The executive order permits agencies to use a *Glomar* response to protect classified information. Thus, instead of invoking a specific exemption that would acknowledge possession of classified documents and impliedly an investigation, Treasury declines to admit or deny the existence of such information.

OFAC does not disclose whether it is investigating a person or an entity for purposes of imposing economic sanctions.[48] By acknowledging an OFAC investigation, a suspect group or person upon learning of the investigation could take steps to avoid or divert the investigation. It could move assets and records beyond the jurisdiction of the United States. For this reason,

only after Treasury designates an entity as terrorist-related and blocks its assets does it notify that organization.

Cozen maintains that Treasury already has revealed investigations into some of these entities in congressional testimony. Cozen cites the testimony of former director of OFAC, Richard Newcomb, and other officials who testified that OFAC had "concerns" about several of the entities. Cozen also claims that Treasury has disclosed to Congress that it maintains evidentiary files for entities it has not chosen to designate.

The crux of Cozen's argument against Treasury's use of the *Glomar* response is that Treasury has routinely discussed its concern regarding several of the entities. To support its argument, Cozen cites the testimony of Newcomb; Juan Zarate, Treasury's Deputy Assistant Secretary in its Executive Office for Terrorist Financing and Financial Crime; and Stuart Levey, Under Secretary for Terrorism and Financial Intelligence. Cozen specifically relies upon Newcomb's testimony that Treasury did not make sanctions recommendations as to the National Commercial Bank of Saudi Arabia or the World Assembly for Muslim Youth ("WAMY"). He acknowledged that Treasury was looking at "several hundred" Saudi charities. Also, Newcomb stated in his testimony that Treasury did not conclude in deliberations that WAMY was financing terrorism, but left it open as to whether Treasury ever investigated the charity. Zarate admitted in his testimony to working closely with the Saudis with respect to WAMY, Muslim World League ("MWL") and IIRO to determine whether they had been infiltrated

---

**47.** Section 3.6(a) specifically states that "an agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this or-

der or its predecessors." Exec. Order 13,292, § 3.6(a).

**48.** Szubin Decl. ¶¶ 32–37. Szubin's declaration details how national security implications justify a *Glomar* response in this case.

by Al Qaeda. Levey noted before Congress that WAMY, MWL, and IIRO were concerns.

Cozen also argues that information regarding Saudi High Commission for Bosnia and Herzegovina is in the public domain. It notes that NATO raided the Commission's offices in October 2001 and found materials relating to the 1998 East African Embassy bombings. Additionally, it contends the State Department released a fact sheet in August 1996 on Osama Bin Laden and names Al Shamal Islamic Bank as having been founded by Bin Laden.

Finally, Cozen addresses its request for information concerning IIRO. IIRO, based in Jeddah, has branches that have been implicated in terrorism, specifically the embassy bombings. On June 13, 2006, Treasury issued a *Glomar* response with respect to IIRO. Then on August 3, 2006, it designated the Philippine and Indonesian branches as sponsors of terrorism. Also, Treasury has disclosed that it has investigated the Saudi headquarters of IIRO and a Saudi IIRO official was accused of bankrolling Al Qaeda in Southeast Asia.

■■■ Information already in the public domain cannot be withheld. To be considered public, the specific information must be identical to that previously released through a documented official disclosure. *See Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 60 (D.C.Cir.2003); *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C.Cir.1990) (citing *Afshar*, 702 F.2d at 1133). Information discussed publicly does not automatically qualify as public for the purpose of the "public domain" exception. Nor do generalized allegations that classified information has been leaked to the press establish that the information is public knowledge. The information must have been officially acknowledged to be considered public. *See Public Citizen v. Dep't of State*, 11

F.3d 198, 201–02 (D.C.Cir.1993). Accordingly, non-official references to information do not constitute public information.

■■■ The requester has the burden of proving that the specific information has been officially disseminated to the public. *Hoch v. CIA*, 907 F.2d 1227 (D.C.Cir.1990) (unpublished table decision); *Afshar*, 702 F.2d at 1130. If the requester meets its burden, the agency must release the information.

■■■ Cozen suggests that because there is public discussion about terrorist links to some of the entities, Treasury must have instigated investigations into them and would have to have known about them. Consequently, Cozen argues there would be no harm in disclosing that Treasury has information about them in its files. Treasury responds that this public statement does not constitute an acknowledgment that it has "open evidentiary files" on the entities. Treasury notes Cozen's lack of support for its arguments and also states that before finding the information is public, the court must be confident that the information sought is truly public and that the requester will receive no more than what is already publicly available. *Students Against Genocide*, 257 F.3d at 836 (citing *Cottone v. Reno*, 193 F.3d 550, 555 (D.C.Cir.1999)).

Treasury's invocation of the *Glomar* responses is appropriate. The classified and unclassified affidavits provide sufficient information to justify the use of the *Glomar* responses. Specifically, disclosing that OFAC is or is not investigating a non-designated entity or person would thwart the purpose of the sanctions program and would reveal classified information, alerting terrorists who could move money before sanctions are imposed or funnel assets through organizations that are not being investigated.

Although Treasury may have mentioned its "concerns" during various officials' congressional testimony, it has never publicly revealed that it has opened investigatory evidentiary files on these sixteen organizations nor has it stated that it is actively investigating any one of the sixteen organizations. Public suspicion that a person or entity has terrorist connections does not mean or prove that Treasury is conducting a designation investigation of that person or entity.

Cozen supplements its public domain argument with an argument that Treasury cannot assert *Glomar* responses for two organizations, Saudi Joint Relief for Kosovo and Saudi High Commission for Bosnia and Herzegovina, because they no longer exist. Cozen has not produced evidence that Saudi Joint Relief for Kosovo and Saudi High Commission for Bosnia and Herzegovina are defunct organizations. More importantly, they could still be under investigation and have assets subject to blocking. Thus, Cozen's argument is not supported by the facts.

### Conclusion

Because there are questions regarding the adequacy of Treasury's search and the applicability of asserted exemptions to a few of the withheld documents, summary judgment cannot be granted at this time. I shall give Treasury the opportunity to submit a supplemental declaration addressing the questions raised in this memorandum opinion. Treasury may then renew its summary judgment motion.